460 F.3d 409
 Robert Charles REULAND, Plaintiff-Appellee,
v.
Charles J. HYNES, individually and in his capacity as District Attorney for the County of Kings, New York, Defendant-Appellant.
Docket No. 04-5521-cv.
 United States Court of Appeals, Second Circuit.
 Argued: October 25, 2005.
 Decided: August 21, 2006.
 
 Elizabeth I. Freedman, Assistant Corporation Counsel (Michael A. Cardozo, Corporation Counsel of the City of New York, on the brief) New York, NY, for Defendant-Appellant.
 Jane Bilus Gould, Lovett & Gould, LLP, (Brita Nicaj, on the brief) White Plains, NY, for Plaintiff-Appellee.
 Before WINTER, POOLER, and SOTOMAYOR, Circuit Judges.
 POOLER, Circuit Judge.
 
 
 1
 On August 21, 2001, appellee Robert Charles Reuland filed suit against appellant Charles J. Hynes under 42 U.S.C. § 1983 claiming that his demotion within and later firing from the Brooklyn District Attorney's Office was in unlawful retaliation for his exercise of his rights under the First Amendment. Following a trial, the jury returned a special verdict finding that: (1) Reuland had not shown that one of his motives was to address a matter of public concern; (2) Reuland had shown that his statement to New York magazine was a substantial or motivating factor in Hynes's decision to demote him; (3) Hynes had not shown that he would have demoted Reuland in any event because Hynes believed Reuland lied to him; and (4) Reuland had not shown that his speech was a substantial or motivating factor in his termination.
 
 
 2
 Both Reuland and Hynes brought motions pursuant to Federal Rule of Civil Procedure 50(b) seeking entry of judgment in their favor based on the jury's findings of fact. Judge Gleeson ruled that the speaker's motive is not dispositive in determining whether speech is a matter of public concern and that Reuland's statement to New York magazine regarding the crime rate in Brooklyn is a matter of public concern. He also found that in light of the jury's findings regarding Hynes's motivation in demoting Reuland, Hynes cannot show this action was based on the potential for disruption rather than retaliation or avoid liability based on qualified immunity. He therefore issued an order directing that judgment be entered in favor of the plaintiff.
 
 
 3
 We agree with the district court and hold that the speaker's motive is not dispositive in determining whether speech is on a matter of public concern and that Reuland's statement is a matter of public concern. We also hold that Hynes has waived the issue of disruption by agreeing not to include it in the jury charge. Finally, we hold that Hynes cannot benefit from qualified immunity because it would not have been objectively reasonable for him to believe the speech was unprotected and the jury found that he acted with improper retaliatory motive.
 
 
 BACKGROUND
 
 
 4
 Reuland began working for the Brooklyn District Attorney's office in January 1997. He initially worked in the Grand Jury Bureau, and, after about three weeks, was promoted to the Red Zone, a general trial division. After about a year-and-a-half, he was promoted to Senior Assistant District Attorney.
 
 
 5
 In May 2000, Reuland signed a contract with Random House for the publication of two books, one of which was Hollowpoint, a fictionalized account of a Brooklyn District Attorney that Reuland had already essentially completed. Around the same time, Reuland sought promotion to the Homicide Bureau. He met with the District Attorney, Charles Hynes, to discuss this possibility on May 31, 2000. They discussed Reuland's book, which Reuland assured Hynes contained no negative information about the office. Shortly after this conversation, on June 5, 2000, Reuland was promoted to the Homicide Bureau.
 
 
 6
 Hollowpoint was published on March 27, 2001. A couple of months before, in early 2001, Reuland was interviewed in his Homicide Bureau office by a reporter for New York magazine for an article about young lawyers in New York. The article was published in the February 26, 2001, issue of the magazine, which became available prior to that date, and discussed Reuland's upcoming book. The article also quoted Reuland as saying, "Brooklyn is the best place to be a homicide prosecutor" because "[w]e've got more dead bodies per square inch than anyplace else." Cameron Stracher, Raising the Bar, N.Y. Mag., Feb. 26, 2001, at 31.
 
 
 7
 On February 22, 2001, after the article was published, Reuland met with First Assistant District Attorney Amy Feinstein, who told him that prominent politicians were outraged over his description of Brooklyn in the article.[1] Reuland explained that he did not mean the statement to be literally true and was merely trying to explain why he enjoyed his job. He offered to write a letter to the editor explaining his remark. Feinstein and Assistant District Attorney Barry Schreiber edited Reuland's draft letter, and Hynes approved it. The letter explained that while the quote was correct:
 
 
 8
 [T]his was not intended to be, nor is it, literally true. In fact Brooklyn's murder rate has declined more than 66 percent during the past decade. Even with the remarkable reduction, the loss of life remains high and still keeps a homicide prosecutor busy—the point of my hyperbolic remark.
 
 
 9
 The letter was published in the April 2, 2001, issue. Letters, N.Y. Mag., Apr. 2, 2001, at 8.
 
 
 10
 On March 9, 2001, Reuland met with Hynes, who told him that his remarks were hurtful because, as District Attorney, Hynes had actually reduced the crime rate. Reuland says he explained that from his perspective, working directly with crime victims, there was still a great deal of work to be done and that he loved working as a prosecutor in Brooklyn in part because he felt he could make a difference. Hynes was not satisfied with this explanation and accused Reuland of lying to him and seeking the promotion to the Homicide Bureau simply to sell books. Hynes told Reuland he could either accept transfer to the Orange Zone, which would constitute a demotion back to a trial bureau, or quit. Ultimately, Reuland accepted the demotion.
 
 
 11
 Reuland did not receive positive reviews of his performance while in the Orange Zone. On July 16, 2001, Reuland wrote to Feinstein to request transfer back to the Homicide Bureau. Feinstein denied this request, and, the next day, told Reuland she expected his resignation by the end of the day. Reuland sent her his resignation.
 
 
 12
 After his termination, Reuland filed suit against Hynes in the Eastern District of New York claiming adverse employment actions in retaliation for his exercise of his First Amendment right to freedom of speech. Hynes moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) and on the basis of qualified immunity, which the district court denied. See Reuland v. Hynes, No. 01-cv-5661 (E.D.N.Y. April 12, 2002). Hynes appealed to this Court, and we affirmed by summary order, finding issues of fact and law that precluded resolution in Hynes's favor. See Reuland v. Hynes, 53 Fed. Appx. 594 (2d Cir.2004). Following remand and discovery, Hynes moved for summary judgment, which the district court denied in a detailed opinion setting out numerous factual disputes that required resolution at trial. See Reuland v. Hynes, 2004 WL 1354467 (E.D.N.Y. June 17, 2004).
 
 
 13
 A jury trial was held, at which Hynes testified that he met with Reuland after the New York magazine statement was published because he wanted to know why Reuland would say something that was not supported by statistics. Hynes also testified that he decided to demote Reuland during this meeting because he believed Reuland had lied to him about his reasons for seeking a transfer to the Homicide Bureau. Hynes did not express any concern that, because Reuland's statement to New York magazine had been untrue, Reuland's credibility would be destroyed and he would no longer be able to function effectively as a prosecutor, as Hynes now contends.
 
 
 14
 After the conclusion of testimony, Judge Gleeson held a conference with the parties to go over the verdict form and jury charge. At this conference, defense counsel suggested the jury be asked if Hynes reasonably believed Reuland's false statement to New York magazine would interfere with their working relationship, a fact that could then be weighed by the court in determining the Pickering balance. See Pickering v. Bd. of Ed., 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). The district court found that the evidence presented went only to whether Reuland had lied to Hynes about his reasons for seeking a promotion to the Homicide Bureau, not whether he had lied in general, and suggested this was "not a Pickering question, it's a causation question." Defense counsel agreed and did not object to the district court's failure to ask any questions related to disruption.
 
 
 15
 The jury found that Reuland's statement in New York magazine was a motivating factor in Hynes's decision to demote him, and that, absent this motivation, Reuland would not have been demoted anyway, because Hynes believed Reuland had lied to him. However, they found that the statement was not a motivating factor in Reuland's termination. The jury also found that, in making the statement, Reuland was not motivated by a desire to address a matter of public concern. On the issue of damages, the jury awarded $30,000 for Reuland's demotion and declined to award punitive damages.
 
 
 16
 Both Reuland and Hynes sought entry of judgment in their favor based on the jury's findings of fact. Judge Gleeson held that the jury's finding regarding Reuland's motive was not dispositive in determining whether that speech addressed a matter of public concern and concluded that the crime rate in Brooklyn is inherently a matter of public concern. See Reuland v. Hynes, 01-cv-5661, 2004 WL 2098664, at *2-7 (E.D.N.Y. Sept.17, 2004). He further held that the jury's finding regarding Hynes's motivation precluded Hynes from showing that the reason for the demotion was disruption, and from demonstrating he was entitled to qualified immunity. Id. at *8-9. Therefore, he entered judgment in favor of Reuland in the amount of $30,000. Id. at *9.
 
 
 17
 Hynes contends on appeal that (1) the jury's finding regarding Reuland's motive conclusively establishes that the statement was not on a matter of public concern; (2) regardless, the statement is not on a matter of public concern; (3) Reuland's speech interest is outweighed by the District Attorney's reasonable concern about disruption; and (4) Hynes is entitled to qualified immunity. At oral argument and in a post-argument 28(j) letter to the court, Hynes further argues that Reuland's speech was not entitled to any constitutional protection because it was false.
 
 
 DISCUSSION
 
 
 18
 
 I. Protection of Hyperbolic Speech under the First Amendment
 
 
 
 19
 We note, as an initial matter, that the fact that Reuland's statement was not literally true does not automatically deprive it of First Amendment protection.[2] False speech, as well as hyperbole, is still entitled to First Amendment protection, as long as it is not made with knowledge or reckless disregard of its falsity. See N.Y. Times Co. v. Sullivan, 376 U.S. 254, 271, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) ("The constitutional protection does not turn upon the truth, popularity, or social utility of the ideas and beliefs which are offered. . . . To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration." (internal quotations and citations omitted)); see also Hustler Magazine v. Falwell, 485 U.S. 46, 56-57, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988) (finding parody that was not reasonably believable was protected by the First Amendment). This has been a longstanding principle of First Amendment law because "erroneous statement is inevitable in free debate, and . . . it must be protected if the freedoms of expression are to have the `breathing space' that they `need to survive.'" Sullivan, 376 U.S. at 271-72, 84 S.Ct. 710 (citations omitted).
 
 
 20
 The same First Amendment protection for false speech applies even in the context of public employee speech, where the government has somewhat greater latitude. Pickering, 391 U.S. at 574, 88 S.Ct. 1731 ("[A]bsent proof of false statements knowingly or recklessly made by him, a [public employee]'s exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal. . . ."). In Pickering, one of the foundational Supreme Court cases in this area of law, the Court found that some of the statements at issue were false, but nevertheless accorded those statements constitutional protection, concluding that the employer's interest in preventing the speech did not outweigh the employee's interest in free speech. Id. at 572-73, 88 S.Ct. 1731.
 
 
 21
 Because Reuland's statement was, as all parties concede, hyperbole, to demonstrate that it is not entitled to First Amendment protection Hynes would have to show that the statement (1) would reasonably have been perceived as an assertion of fact, (2) was false, and (3) was made with knowledge or reckless disregard of its falsity.[3] Hustler, 485 U.S. at 56-57, 108 S.Ct. 876. He has not done so. Despite the dissent's assumption to the contrary, there is nothing in the record that would even show Reuland's statement was in fact false, let alone that he made it with knowledge or reckless disregard of its falsity.[4] Indeed, in 2000 and 2001, around the time Reuland made his statement, Brooklyn had more homicides than any other borough of New York City as well as more violent crime per 100,000 people than any other borough. See New York State Division of Criminal Justice Services, 2000-2001 Crime and Justice Annual Report, Sec. 1, Part 1, available at http://criminaljustice.state.ny.us/crimnet/ojsa/cja_00_01/contents.htm. Therefore, we cannot conclude that Reuland's statement is deprived of First Amendment protection simply because it may not have been entirely accurate, and thus we continue the analysis under the same rubric as other public employee speech.
 
 
 II. First Amendment Retaliation Law
 
 
 22
 "For over 30 years the Supreme Court has consistently held that while the government enjoys significantly greater latitude when it acts in its capacity as employer than when it acts as sovereign, the First Amendment nonetheless prohibits it from punishing its employees in retaliation for the content of their protected speech." Locurto v. Safir, 264 F.3d 154, 166 (2d Cir.2001). To determine whether an employee's speech rights have been violated by an adverse employment action, we first apply a two-part test.[5] See Melzer v. Bd. of Ed., 336 F.3d 185, 193 (2d Cir.2003). First, the court determines, as a matter of law, whether the speech relates to a matter of public concern. Id. If so, the adverse action nevertheless does not violate the employee's rights "if the employee's speech is reasonably likely to disrupt the effective functioning of the office, and the employee is fired to prevent this disruption." Sheppard v. Beerman, 317 F.3d 351, 355 (2d Cir.2003) (citing Jeffries v. Harleston, 52 F.3d 9, 12-13 (2d Cir.1995)). To prevail on this second step, the government must show, under the Pickering balancing test, that the employee's interest in free speech is outweighed by the employer's interest in avoiding disruption. See Melzer, 336 F.3d at 193.
 
 
 23
 A third aspect of the retaliation inquiry deals with causation. Initially, to make out a prima facie case, the employee must show that the speech was a substantial or motivating factor in the adverse action. Sheppard, 317 F.3d at 355. The burden then shifts to the government to show that "it would have undertaken the same adverse employment action even absent the protected speech." Melzer, 336 F.3d at 193. Finally, even if the government prevails in the Pickering balance, "the employee may still carry the day if he can show that the employer's motivation for the discipline was retaliation for the speech itself, rather than for any resulting disruption."[6] Id.
 
 
 III. Public concern
 
 
 24
 We first address whether Reuland's statement to New York magazine constituted a matter of public concern.[7] Hynes contends that because the jury found Reuland was not motivated by a desire to address a matter of public concern, his speech cannot have been a matter of public concern. We disagree. We hold that the speaker's motive, while one factor that may be considered, is not dispositive as to whether his speech addressed a matter of public concern.
 
 
 25
 Whether Reuland's speech is a matter of public concern is important because "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision. . . ." Connick v. Myers, 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (citation omitted). "Speech by a public employee is on a matter of public concern if it relates `to any matter of political, social, or other concern to the community.'" Johnson v. Ganim, 342 F.3d 105, 112 (2d Cir.2003) (quoting Connick, 461 U.S. at 146, 103 S.Ct. 1684). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147-48, 103 S.Ct. 1684.
 
 
 26
 The facts of the Supreme Court's decision in Connick indicate that motive is not dispositive as to whether an employee's speech is a matter of public concern. That case involved an assistant district attorney who had circulated a questionnaire in the office. Id. at 140-41, 103 S.Ct. 1684. The Court noted that her motivation in doing so was to "gather ammunition for another round of controversy with her superiors." Id. at 148, 103 S.Ct. 1684. Nevertheless, the Court found that one question, whether assistant district attorneys felt pressured to work on political campaigns, did address a matter of public concern. Id. at 149-50, 103 S.Ct. 1684. Therefore, it went on to conduct the Pickering balancing test. Id. at 150, 103 S.Ct. 1684. Because Myers's motivation for circulating the entire questionnaire was the same, if motive was dispositive, the Court would not have reached the Pickering balancing.[8] Therefore, the speaker's motive cannot be the only factor that we consider in deciding whether Reuland's statement is a matter of public concern.
 
 
 27
 Similarly, in United States v. National Treasury Employees Union [hereinafter NTEU], the Supreme Court found the speech at issue to be a matter of public concern because "the content of the respondents' messages had nothing to do with their jobs and does not even arguably have any adverse impact on the efficiency of the office in which they work. They do not address audiences composed of co-workers or supervisors; instead, they write or speak for segments of the general public." 513 U.S. 454, 465, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995). Yet, at least part of the motivation for the speech at issue in NTEU was to receive financial compensation because the case challenged not a restriction on the speech itself, but on public employees receiving honoraria for their speech. Id. Thus, although Reuland's statement does not fit neatly into the citizen-employee distinction discussed in Connick and NTEU, we cannot conclude the fact that his motivation to sell books means his speech does not address a matter of public concern.
 
 
 28
 Our previous cases suggesting that the speaker's motive might indicate that the speech is not on a matter of public concern have focused primarily on private motives related to employment grievances. See, e.g., Ezekwo v. NYC Health & Hosps. Corp., 940 F.2d 775, 781 (2d Cir.1991) ("Ezekwo was not on a mission to protect the public welfare. Rather, her primary aim was to protect her own reputation and individual development as a doctor."); White Plains Towing Corp. v. Patterson, 991 F.2d 1049, 1060 (2d Cir.1993) ("Although [plaintiff's] First Amendment interest in filing his short-lived personnel complaint would be weak if, as the trial record strongly suggests, he took that action solely to obtain additional towing referrals, the trial court did not err in ruling the personnel complaint did at least minimally touch upon a matter of public concern."); Blum v. Schlegel, 18 F.3d 1005, 1012 (2d Cir. 1994) (noting that private motives such as "facing termination for personal consumption of marijuana" or "trying to evade or discredit a drug testing program" might mean that employee speech advocating the legalization of marijuana was not protected). In Ezekwo, the only one of these cases to conclude the speech at issue was not a matter of public concern, we relied not only on the motive of the speaker, but on the content of the speech, finding that both were related to personal grievances. 940 F.2d at 781.
 
 
 29
 In Lewis v. Cowen, we noted that, in determining whether an employee's speech addresses a matter of public concern, "the court should focus on the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." 165 F.3d 154, 163-64 (2d Cir.1999). Nevertheless, consistent with our previous cases, we focused on private motives related to employment, stating that "speech on a purely private matter, such as an employee's dissatisfaction with the conditions of his employment, does not pertain to a matter of public concern." Id. at 164. None of these cases suggest that the speaker's motive alone is dispositive of the public concern issue, and this is especially true where this motive is not to address an employment grievance.
 
 
 30
 Other circuits that have considered the role of motive on the question of public concern have almost uniformly agreed with our reading of Connick and found that motive is not dispositive. See Tripp v. Cole, 425 F.3d 5, 11 (1st Cir.2005) ("Where a public employee speaks out on a topic which is clearly a legitimate matter of inherent concern to the electorate, the court may eschew further inquiry into the employee's motives . . . ." (internal quotation marks and citation omitted)); Markos v. City of Atlanta, 364 F.3d 567, 572-73 (5th Cir.2004) (noting that although motivation is often relevant, it is not "the new litmus test for the matter of public concern analysis, displacing the Connick factors"); Anderer v. Jones, 385 F.3d 1043, 1053 (7th Cir.2004) ("We acknowledge that motive is relevant to the matter of public concern inquiry, though it is not dispositive." (internal quotations and alterations omitted)); Alpha Energy Savers, Inc. v. Hansen, 381 F.3d 917, 925 (9th Cir.2004) ("[W]e have held that motive should not be used as a litmus test for public concern; rather, content is the greatest single factor in the Connick inquiry." (internal quotations omitted)); Azzaro v. County of Allegheny, 110 F.3d 968, 978 (3d Cir.1997) ("Connick indicates that the speaker's motive, while often a relevant part of the context of the speech, is not dispositive in determining whether a particular statement relates to a matter of public concern."); Chappel v. Montgomery County Fire Prot. Dist. No. 1, 131 F.3d 564, 576 (6th Cir.1997) ("[T]he motive which underlies an employee's statements is a relevant, but not necessarily dispositive factor in considering whether an employee's statements may be fairly characterized as relating to any matter of political, social, or other concern to the community." (citation and internal quotation marks omitted)); Morris v. Crow, 117 F.3d 449, 457 (11th Cir.1997) ("[A]n employee's motive for speech, while not dispositive, is a factor that must be considered in determining whether speech is a matter of public concern."); Barnard v. Jackson County, 43 F.3d 1218, 1226 (8th Cir.1995) ("Insofar as self-interest is found to have motivated public-employee speech, the employee's expression is entitled to less weight in the Pickering balance than speech on matter of public concern intended to serve the public interest." (internal quotations and alterations omitted)). Only the Tenth Circuit has potentially treated motive as dispositive, although it has not explicitly so held. See, e.g., Schalk v. Gallemore, 906 F.2d 491 (10th Cir.1990) ("In drawing the thin line between a public employee's speech which touches on matters of public concern, and speech from the same employee which only deals with personal employment matters, we have looked to the subjective intent of the speaker.").
 
 
 31
 We join the majority of circuits in finding that the speaker's motive is not dispositive as to whether an employee's speech relates to a matter of public concern. Therefore, the jury's finding that Reuland was not motivated by a desire to address a matter of public concern does not resolve the issue. Under Connick, we must consider the "content, form, and context of a given statement, as revealed by the whole record." Johnson, 342 F.3d at 112 (quoting Connick, 461 U.S. at 147-48, 103 S.Ct. 1684).
 
 
 32
 Reuland's statement addressed the crime rate in Brooklyn. We have previously held that crime rates are inherently a matter of public concern. See Morris v. Lindau, 196 F.3d 102, 111 (2d Cir.1999) ("[S]peech on crime rates, police staffing, equipment shortages and related budgetary matters quite plainly involve matters of public concern."). Certainly crime is a "matter of political, social, or other concern to the community." Johnson, 342 F.3d at 112. In contrast to previous cases in which we considered the speaker's motive significant, Reuland's statement did not relate to employment policies or other internal workplace grievances. In addition, the statement was made in an interview with a magazine with public circulation and not simply to co-workers. We therefore have little difficulty concluding that Reuland's statement to New York magazine addressed a matter of public concern.
 
 
 IV. Pickering Balancing
 
 
 33
 Hynes argues on appeal that he demoted Reuland because Reuland's hyperbolic statement made him untrustworthy, a quality that would undermine his effectiveness as a prosecutor. Hynes further contends that this disruption of the effectiveness of the district attorney's office outweighed Reuland's interest in the speech under the Pickering balance. Although this argument is not without merit, we hold that Hynes has waived the issue of the disruption by agreeing not to submit the underlying facts of his disruption claim to the jury.
 
 
 34
 Hynes presented few arguments regarding the Pickering balance throughout the proceedings below. Initially, in his motion for judgment on the pleadings, Hynes argued that the Pickering balance tipped sharply in his favor. However, on appeal from the denial of that motion to this court, Hynes argued only that the speech at issue did not pertain to a matter of public concern. Furthermore, in his motion for summary judgment, Hynes made no argument regarding the Pickering balance.
 
 
 35
 More importantly, Hynes explicitly waived the issue of the Pickering balance at the jury charge conference by agreeing that the jury need not decide whether the adverse employment actions were motivated by the potential for disruption, rather than retaliation. At that conference, Hynes's counsel suggested that the jury be asked: "did the Defendant Hynes reasonably believe that the plaintiffs false statement to the New York Magazine did or would likely interfere with the good working relationship between the plaintiff and the defendant." She suggested that this was part of the Pickering balancing test. Alternatively, the district court proposed to ask the jury whether Hynes demoted Reuland because he believed Reuland lied to him. Hynes's counsel attempted to broaden this to simply "he had lied period," but the court responded: "That is not what the evidence is. . . . The whole issue whether he lied to him. This really isn't . . . a Pickering question, it's a causation question. It is a way of focusing more precisely on your version of what caused the demotion." Rather than persist in her Pickering argument, Hynes's counsel replied, "I think that is right. I think what Your Honor has proposed will work." Generally, we need not consider a claim on appeal where the party advancing it consented not to submit it to the jury below. See Coffey v. Dobbs Int'l Servs., Inc., 170 F.3d 323, 325 n. 2 (2d Cir.1999); Getty Petroleum Corp. v. Bartco Petroleum Corp., 858 F.2d 103, 106-07 (2d Cir.1988) (holding that a theory of recovery pleaded but not submitted to the jury by explicit agreement need not be considered on appeal). By failing to make clear to the district court that he also wanted to raise the issue of whether Reuland's reputation for truthfulness would damage his work as a district attorney and instead agreeing to the district court's decision not to include any questions about disruption in the jury charge, Hynes affirmatively waived the issue of the Pickering balance.
 
 
 36
 In addition, Hynes's failure to submit the Pickering balance to the jury has left factual questions unresolved that would make it impossible for us to decide this issue. The jury should have resolved whether Hynes was in fact motivated by a desire to avoid disruption, rather than retaliation, and whether his concern about disruption was reasonable. See Gorman-Bakos v. Cornell Coop. Extension, 252 F.3d 545, 557-58 (2d Cir.2001) (finding that factual disputes underlying Pickering balance must be submitted to the jury). Therefore, because it was raised too late for these factual disputes to be submitted to the jury, Hynes's halfhearted attempt to revive this issue after the jury verdict in a footnote to his motion for judgment as a matter of law cannot alter our conclusion that it was waived. See Reuland, 2004 WL 2098664, at *6 n. 5.
 
 
 V. Qualified Immunity
 
 
 37
 "Under the doctrine of qualified immunity, a government official performing discretionary functions is shielded from liability for civil damages if his conduct did not violate clearly established rights or if it would have been objectively reasonable for the official to believe his conduct did not violate plaintiff's rights." Mandell v. County of Suffolk, 316 F.3d 368, 385 (2d Cir.2003). However, where, as here, "specific intent is actually an element of the plaintiff's claim as defined by clearly established law, it can never be objectively reasonable for a government official to act with the intent that is prohibited by law." Locurto, 264 F.3d at 169. Because previous cases have recognized and defined the First Amendment right of public employees to be free from retaliation for speech on matters of public concern with reasonable clarity, Hynes would be entitled to qualified immunity only if it was objectively reasonable for him to believe that he could demote an assistant district attorney for making a hyperbolic statement regarding the crime rate without violating that right. See Anderson v. Recore, 317 F.3d 194, 197 (2d Cir.2003) (noting that a right is clearly established if "(1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful" (citation and internal quotation marks omitted)).
 
 
 38
 First, we address whether it was objectively reasonable for Hynes to believe Reuland's statement to New York magazine was not a matter of public concern, either because it was false or because Reuland's motive in making the statement was to sell books. In finding that hyperbolic speech is protected by the First Amendment, we rely on well-established precedent from the Supreme Court. See supra Part I; see also Hustler, 485 U.S. at 57, 108 S.Ct. 876; Pickering, 391 U.S. at 574, 88 S.Ct. 1731; Sullivan, 376 U.S. at 271-72, 84 S.Ct. 710. Therefore, it would not have been reasonable for Hynes to believe that Reuland's statement was not protected because it was untrue.
 
 
 39
 Our conclusion that the speaker's motive is not dispositive in determining whether speech addresses a matter of public concern rests primarily on Connick, another well-established Supreme Court precedent. See supra Part III; see also, Connick, 461 U.S. at 147-50, 103 S.Ct. 1684. Although it would have been reasonable for Hynes to believe that Reuland's motive would be relevant in determining whether his statement is a matter of public concern, this is not enough. Connick's command to consider the "content, form, and context" of the speech, as well as the Supreme Court's application of that test, would have suggested to any objectively reasonable government official that the speaker's motive is not dispositive. See 461 U.S. at 147-48, 103 S.Ct. 1684. NTEU also suggested that a financial motive does not mean speech is not a matter of public concern. See 513 U.S. at 465, 115 S.Ct. 1003. Finally, the fact that nearly every circuit to consider the issue has found motive is not dispositive should have alerted Hynes that it would not be reasonable to assume otherwise. See Tripp, 425 F.3d at 11; Markos, 364 F.3d at 572-73; Anderer, 385 F.3d at 1053; Alpha Energy, 381 F.3d at 925; Chappel, 131 F.3d at 576; Azzaro, 110 F.3d at 978; Morris, 117 F.3d at 457; Barnard, 43 F.3d at 1226. Further, we have previously held that crime rates are a matter of public concern. See Morris, 196 F.3d at 111. Thus, we conclude it would not have been objectively reasonable for Hynes to believe that merely because Reuland was motivated by a desire to sell books that his statement was not a matter of public concern.
 
 
 40
 Next, we consider whether it would have been objectively reasonable for Hynes to believe that he could prevail on the Pickering balance. Because even if the disruption outweighed the employee's speech interest, "the employee may still carry the day if he can show that the employer's motivation for the discipline was retaliation for the speech itself, rather than for any resulting disruption," Hynes would be entitled to qualified immunity on this basis only if a finder of fact determined that he had no retaliatory motive. Hynes has waived this issue by not submitting it to the jury. See supra Part IV. Therefore he cannot now claim qualified immunity on this basis.
 
 
 41
 Because it would not have been objectively reasonable for Hynes to believe he could demote Reuland in retaliation for his hyperbolic statement to New York magazine, and he did not request that the jury decide if he was motivated by disruption rather than retaliation, Hynes is not entitled to qualified immunity.
 
 
 CONCLUSION
 
 
 42
 Accordingly, for the reasons set forth above, we affirm the district court's entry of judgment in favor of Reuland.
 
 
 43
 Judge WINTER dissents in a separate opinion.
 
 
 
 Notes:
 
 
 [1]
 State Senator Marty Markowitz had contacted her to express his displeasure, and then Feinstein had told Hynes about it, who had asked her to speak to Reuland
 
 
 [2]
 At oral argument we requested the parties submit letter briefs on this issue and whether it was raised below. We have received these briefs and given them due consideration
 
 
 [3]
 Of course, the very definition of a hyperbolic statement is that it exaggerates the size or intensity of somethingSee Webster's Third New International Dictionary 1112 (1986).
 
 
 [4]
 The dissent makes much of Reuland's failure to provide any statistical basis for the statement, but, although the burden of proving falsity in this context has not yet been decided by our circuit, it is far from clear that it would be on ReulandSee Sullivan, 376 U.S. at 271, 84 S.Ct. 710 (noting that putting the burden of proving truth on the speaker is disfavored).
 
 
 [5]
 Under the Supreme Court's recent decision inGarcetti v. Ceballos, ___ U.S. ___, ___, 126 S.Ct. 1951, 1959-60, 164 L.Ed.2d 689 (2006), before an employee's speech is entitled to First Amendment protection, we must also determine that he was not speaking pursuant to his duties as an employee. That is clearly not the case here.
 
 
 [6]
 The district court in this case treated these two causation inquiries as the same. This would allow the employee to avoid thePickering balance and prevail only on causation. Because we assume the Pickering balance cannot be obviated in this fashion, these questions must in fact be different. We need not resolve the precise contours of that difference here.
 
 
 [7]
 InLocurto v. Giuliani, 447 F.3d 159, 174-75 (2d Cir. Apr.27, 2006), we recently questioned whether an off-duty employee speaking about non-work matters had to satisfy the public concern test to be entitled to protection under the First Amendment. We did not resolve that question in that case, however, see id. at 175, and need not do so here as Reuland was speaking to New York magazine about work-related matters.
 
 
 [8]
 Although in its recent decision inSan Diego v. Roe, 543 U.S. 77, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004), the Supreme Court stated that in Connick, "the Court held that no Pickering balance was required," id. at 83, 125 S.Ct. 521, it is clear that the Court was referring to those questions on the questionnaire circulated by Myers that did not address matters of public concern. As the Court then explained, "Connick held that a public employee's speech is entitled to Pickering balancing only when the employee speaks `as a citizen upon matters of public concern' rather than `as an employee upon matters only of personal interest.'" Roe, 543 U.S. at 83, 125 S.Ct. 521 (quoting Connick, 461 U.S. at 147, 103 S.Ct. 1684).
 
 
 WINTER, Circuit Judge, dissenting:
 
 44
 I respectfully dissent.
 
 
 45
 A prosecutor's statement to a magazine about homicide rates within his jurisdiction is not protected by the First Amendment when it was admittedly false, admittedly made without any belief of a basis in fact, and made to promote sales of the prosecutor's novel. Hustler Magazine v. Falwell, 485 U.S. 46, 52, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988) (noting that speech is not protected when "made with knowledge that it was false or with reckless disregard of whether it was false or not") (internal quotation marks and citation omitted). Labeling false speech "hyperbole" does not render it protected. A government employee who purposefully or recklessly misinforms the public about a fact specifically related to his area of employment responsibility in order to profit monetarily should not be rewarded by a money judgment from a federal court when he is demoted. Established First Amendment doctrine provides no support for placing the mantle of victimhood upon such an employee.
 
 I. The Facts
 
 46
 In the course of promoting a novel he had written, the plaintiff, Reuland, gave an interview to New York magazine. A reader of the resultant article would have learned that Reuland was a homicide prosecutor in Brooklyn. Reuland described Brooklyn as "the best place" to hold such a job because it had "more dead bodies per square inch than anyplace else." Even though the statement was indeed hyperbolic —no reasonable person would believe that homicide rates are compiled on a "dead bodies per square inch" basis—a reasonable reader would infer that Reuland as a prosecutor had personal knowledge of crime rates in Brooklyn and elsewhere and that Brooklyn had a higher homicide rate by meaningful statistical measures than other comparable places. It was so understood by a political leader and Reuland's boss, Hynes, who were upset because it was untrue. As a result, Reuland was demoted.
 
 
 47
 My colleagues assert that there is nothing in the record to show that Reuland's statement was false or that he knew it to be, or recklessly disregarded whether it was, false.[1] The following is the state of the record. Reuland has never claimed that there was a factual basis for the statement "more . . . than anyplace else." When Reuland was challenged by Hynes to provide a statistical basis for the statement[2] and when he testified on his own behalf at trial,[3] Reuland would say only that the statement was "hyperbole" and that it was not intended to be true. Reuland's letter to the magazine conceded that the statement was intended to mean only that "the loss of life remains high," a clear admission that the "more . . . than anyplace else" claim was false.[4] Hynes, on the other hand, testified at trial that Brooklyn did not have the highest homicide rate "by any statistics" of which he was aware.[5]
 
 
 48
 Finally, the jury found as a fact that Reuland's purpose in making the statement was not to speak on a matter of public concern, thereby adopting the defendants' view that Reuland was seeking only to promote sales of his book.
 
 II. The Law
 
 49
 The legal question then is whether a public employee's statement, (i) that is about a subject specifically related to his employment responsibilities, (ii) that is false, (iii) for which the employee had no basis in fact, and (iv) that was made for reasons of personal profit, is protected by the First Amendment.
 
 
 50
 Reuland's sole claim in this regard is that his statement was protected because it was "hyperbole." I have no quarrel with the proposition that a protected statement does not lose protection simply because it is made in exaggerated form that will be understood by reasonable listeners as such. But it is also true that unprotected speech does not gain First Amendment protection by being stated in exaggerated form. Hyperbole is not a genre of speech unto itself; instead it is a rhetorical style used in protected or unprotected speech. Hyperbole is "[e]xtravagant exaggeration that represents something as much greater or less, better or worse, or more intense than it really is or depicts the impossible as actual." Webster's Third New International Dictionary 1112 (unabridged ed.1981). As the Supreme Court has noted, protected speech cannot be deprived of protection because it is clothed in "mere[ ] rhetorical hyperbole, a lusty and imaginative expression of the [underlying protected speech]." Letter Carriers v. Austin, 418 U.S. 264, 286, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974). On the other hand, the rhetorical style alone cannot confer protection where it is "used in such a way as to convey a false representation of fact." Id. In the present case, the core meaning conveyed by Reuland's statement was not protected whether stated plainly or in hyperbolic fashion.
 
 
 51
 To be accorded First Amendment protection, Reuland's statements had to address a matter of public concern. Cobb v. Pozzi, 363 F.3d 89, 102 (2d Cir.2004). As my colleagues state, crime rates are a matter of public concern, but it is precisely that aspect of Reuland's statement that was not just hyperbolic but false. Again, a reader would discount the "per square inch" homicide rate as an exaggeration but would believe that a core of truth existed in statistical measures known to Reuland. The words "more . . . than anyplace else" might possibly be discounted by a reader to mean "among the highest," but they cannot be discounted further without being rendered either contrary to their obvious meaning or so meaningless as not to be addressed to matters of public concern. Reuland can hardly be allowed to prevail by claiming that "more . . . than anyplace else" cannot be read as a comparison to other locales or actually meant "less . . . than anyplace else." Moreover, if no comparison was conveyed, the statement becomes meaningless—Brooklyn has "dead bodies per square inch." The issue of public concern and reckless falsity thus coincide.
 
 
 52
 There is, therefore, no societal interest served by the judgment here. There is an interest in allowing public servants to speak as citizens on matters of public interest, Pickering v. Bd. of Ed., 391 U.S. 563, 569-70, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), but it is not implicated in this case. Reuland was not expressing his point of view on matters of general interest as a private citizen. Rather, he was speaking as a knowledgeable homicide prosecutor and purporting to provide the public with information about homicide rates. Nor are there any concerns over "breathing space" that might call for allowing honestly mistaken statements lest a robust public debate be deterred. New York Times Co. v. Sullivan, 376 U.S. 254, 271-72, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Reuland misinformed the public and did so recklessly, not caring then or later whether there was a factual basis for his statement. The quantum of helpful information available to the public from knowledgeable sources is not enhanced by such self-serving false statements.
 
 
 53
 The judgment here not only furthers no legitimate societal interests but also may have very negative consequences. At the least, it has the potential of wrongly protecting some public servants who misinform the public about the performance of public agencies, impair the performance of those agencies, and thereby betray the public trust. The effect in the case of a prosecutor's office can be particularly harmful because a dedication to accuracy in public statements and a resistance to self-aggrandizing temptations is important to the professionalism of such an office.
 
 
 54
 Existing law clearly reflects these considerations.[6] A knowing or recklessly false statement of fact is not protected by the First Amendment. See Gertz v. Robert Welch, Inc., 418 U.S. 323, 340, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). In Gertz, the Supreme Court stated that
 
 
 55
 there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in `uninhibited, robust, and wide-open' debate on public issues. New York Times Co. v. Sullivan, 376 U.S. at 270, 84 S.Ct. 710. They belong to that category of utterances which `are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.' Chaplinsky v. New Hampshire, 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).
 
 
 56
 Id. (addressing the issue in the context of a defamation case). See also Nike, Inc. v. Kasky, 539 U.S. 654, 664, 123 S.Ct. 2554, 156 L.Ed.2d 580 (2003) (citing Gertz for the statement that "there is no constitutional value in false statements of fact" while recognizing that such a rule might be overbroad, in an unfair business practices case) (Stevens, J., concurring); Illinois ex rel. Madigan v. Telemarketing Assocs., Inc., 538 U.S. 600, 612, 123 S.Ct. 1829, 155 L.Ed.2d 793 (2003) (citing Gertz in explaining that the First Amendment does not shield fraud); Hustler Magazine v. Falwell, 485 U.S. 46, 52, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988) (noting that "[f]alse statements of fact are particularly valueless" but "inevitable in free debate" and so should only be penalized under defamation law when the "statement was made with knowledge that it was false or with reckless disregard of whether it was false or not.") (citations and internal quotation marks omitted); Pugel v. Bd. of Trs. of the Univ. of Illinois, 378 F.3d 659, 668 n. 9 (7th Cir.2004) (stating that "false and recklessly made speech may not be entitled to First Amendment protection even if it purports to touch upon matters of public interest") (citation, alteration, and internal quotation marks omitted). Condit v. Dunne, 317 F.Supp.2d 344, 361 (S.D.N.Y. 2004) (citing Gertz). Reuland admitted at trial that he never intended the statement as truth and has never claimed to have had a factual basis for it.
 
 
 57
 These propositions are underlined by the analysis in Pickering v. Board of Education, 391 U.S. 563, 574, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Pickering was dismissed from his teaching post after sending a letter to a local newspaper that attacked the school board's handling of a bond issue. Id. at 566, 88 S.Ct. 1731. The board argued that Pickering's statements in the letter were false. Id. at 567, 88 S.Ct. 1731. The Supreme Court stated in a footnote that it found most of Pickering's statements to be "substantially correct." Id. at 569 n. 2, 88 S.Ct. 1731. As the allegedly false statements were about the school budget, which was publicly available and on which Pickering had no special expertise, the Supreme Court pointed out that this was not a situation in which a public employee "has carelessly made false statements about matters so closely related to the day-to-day operations of the schools that any harmful impact on the public would be difficult to counter because of the teacher's presumed greater access to the real facts." Id. at 572, 88 S.Ct. 1731. In contrast to Pickering, Reuland was not only speaking on matters as to which a reader would expect him to have special access to the facts but was also reckless, i.e., concededly knew of no factual basis for his statement.
 
 
 58
 Hustler Magazine v. Falwell, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988), relied upon by my colleagues, is hardly authority to the contrary. That case involved a parody of an advertisement for Campari Liqueur that contained a photograph of the Reverend Jerry Falwell and a fictional interview with him, describing an alleged "drunken incestuous rendevous" between Falwell and his mother in an outhouse. Id. at 48, 108 S.Ct. 876. Notably, it contained a notice that this was an "ad parody—not to be taken seriously." Id. Falwell sued for intentional infliction of emotional distress, libel, and invasion of privacy. Id. at 48-49, 108 S.Ct. 876. Because the jury had found that the ad "could not reasonably have been interpreted as stating actual facts" about Falwell, id. at 50, 108 S.Ct. 876, he could not show that Hustler had made a false statement of fact about him with the requisite malice and so could not recover. Id. at 57, 108 S.Ct. 876. In contrast to Hustler, there was no parody here;[7] Reuland's statement was factual—Brooklyn has a murder rate higher than comparable areas by meaningful statistical measures—even if hyperbolic.[8]
 
 
 59
 I therefore dissent.
 
 
 
 Notes:
 
 
 [1]
 My colleagues, after criticizing me for indulging in an "assumption" as to the state of the record, go completely outside the record to find a single statistic that might support Reuland's statement. Although I believe such independent appellate research into adjudicative facts is not permissible, the need for self-defense leads me to answer. The extra-record evidence cited by my colleagues does not suggest that Reuland's statement about Brooklyn's homicide rates relative to the other boroughs and other American cities was remotely accurate. In absolute numbers, Brooklyn had 236 homicides in 2000, lower than Chicago, Illinois' 628; Los Angeles, California's 550; Detroit, Michigan's 396; Philadelphia, Pennsylvania's 319; Baltimore, Maryland's 261; and Washington, D.C.'s 239. NEW YORK DIVISION OF CRIMINAL JUSTICE SERVICES, 2000-2001 CRIME AND JUSTICE ANNUAL REPORT, Part One: Offenses Reported/Known to Police by County (2001),available at http://criminal-justice.state.ny.us/crimnet/ojsa/cja_00_01/sec1b.pdf; FEDERAL BUREAU OF INVESTIGATION, CRIME IN THE UNITED STATES— 2000, TABLE 8: OFFENSES KNOWN TO LAW ENFORCEMENT (2000), available at http://www.fbi.gov/ucr/cius_00/xl/00tbl08.xls. On a per capita basis, Brooklyn's homicide rate in 2000 was 9.57 per 100,000 people, lower than the Bronx (14.26); Gary, Indiana (65.21); Compton, California (57.76); New Orleans, Louisiana (48.28); Washington, D.C., (41.78); Detroit (41.63); Baltimore (40.08); Richmond, Virginia (36.40); St. Louis, Missouri (35.61); Birmingham, Alabama (32.53); Atlanta, Georgia (32.17); Kansas City, Missouri (25.59); Memphis, Tennessee (22.46); Chicago (21.68); Newark, New Jersey (21.20); Philadelphia (21.02); Milwaukee, Wisconsin (20.44); Dallas, Texas (19.43); Miami, Florida (18.21); Los Angeles (14.89); Cleveland, Ohio (14.84); New Haven, Connecticut (14.56); Bridgeport, Connecticut (13.62); Minneapolis, Minnesota (13.07); Tucson, Arizona (12.33); Indianapolis, Indiana (12.28); Syracuse, New York (12.22); Houston, Texas (11.77); Phoenix, Arizona (11.51); and Jacksonville, Florida (10.74). Calculated from FEDERAL BUREAU OF INVESTIGATION, CRIME IN THE UNITED STATES—2000 and NEW YORK DIVISION OF CRIMINAL JUSTICE SERVICES, 2000-2001 CRIME AND JUSTICE ANNUAL REPORT, supra, and population data from the U.S. Census Bureau, Population Finder, available at http://factfinder.census.gov/servlet/SAFFPopulation?_submenuId= population_0 & _sse=on. Applying Reuland's own "per square inch" formulation, it is no surprise that both the Bronx and Manhattan had higher homicide rates per square mile than Brooklyn, which had 2.44 homicides per square mile in 2000 relative to the Bronx's 3.33 homicides per square mile and Manhattan's 4.53. Calculated from NEW YORK DIVISION OF CRIMINAL JUSTICE SERVICES, 2000-2001 CRIME AND JUSTICE ANNUAL REPORT, and the land area of each place, Wikipedia, available at wikipedia.org. Brooklyn also had fewer homicides per square mile than Compton (5.29); Washington, D.C., (3.89); Baltimore (3.23); Detroit (2.85); and Chicago (2.76). Calculated from FEDERAL BUREAU OF INVESTIGATION, CRIME IN THE UNITED STATES—2000, supra, and land area from Wikipedia, supra.
 
 
 [2]
 Hynes's testimony was as follows:
 Q What, if anything, did you do when you saw, read this article?
 A I asked to see Mr. Reuland.
 Q And why was that?
 A I wanted to ask him about his quotation.
 Q What did you want to ask him about his quotation?
 A I wanted to know why he would say something that was not supported by any statistics that I was aware of.
 Q Did you in fact have a meeting with Mr. Reuland?
 A Yes.
 Q When did that meeting occur?
 A It's probably close in time to the publication of this magazine or when he read the magazine.
 Q Do you have a recollection of when that meeting occurred?
 A Specifically, no.
 Q It was you who initiated the meeting?
 A Yes.
 Q Where did it occur?
 A In my office at 350 Jay Street.
 Q What did you say to him at that meeting and what did he say to you?
 A I said did you tell New York Magazine, then I repeated the quote, and he said yes. And I said: How could you say something like that when it's not true?
 Q What did he say?
 A It's hyperbole. And I said no, it's not hyperbole, it's not true.
 Q You had an understanding of what the word hyperbole means?
 A I think so.
 Q It means an exaggeration to make a point?
 A I think that is correct.
 Q Did he explain to context of his comment to you at that time?
 A No, actually, he repeated hyperbole several times.
 Q Did he tell you that was a quote taken in the context of a much longer and fuller interview?
 A He sure did not.
 Q Did he tell you that he was t[r]ying to tell the interviewer why he liked the job of being a prosecutor in the homicide bureau of your office?
 A He most certainly did not.
 Q He never said anything about that?
 A That is correct.
 Q Did he tell you that he did not intend for the comment to be literally true?
 A He said it was hyperbole, so I guess that is the same thing.
 Q So that's what you understood him to say?
 A Yes.
 * * *
 A I wanted to find out—what he could tell me about this statement that was unsupportable by any statistical proof.
 
 
 [3]
 During the trial Reuland testified that he "knew that the concern was the remark was taken literally by Mr. Hynes and by the . . . prominent politicians and I offered to make clear that the remark was not intended for its literal truth." He also testified that "I was trying to say that not statistically, we have more dead bodies per square inch if you took out a ruler and measure the borough, I simply meant there was a lot of crime in Brooklyn" and that "I tried to explain to her that I did not mean the remark for its literal truth but rather I was trying to answer the question about why I liked to be a prosecutor." When his supervisor told him Hynes was offended by his remark because, according to Reuland's testimony, Hynes "took it for literal truth," Reuland stated that "I tried to convince her that was not my intention and I think I succeeded in it."
 
 
 [4]
 Rob Reuland, Letter to the Editor,Body Count, N.Y. MAG., April 2, 2001, at 8.
 
 
 [5]
 Hynes' testimony was as follows:
 Q: What did you want to ask him about his quotation?
 A: I wanted to know why he would say something that was not supported by any statistics I was aware of.
 
 
 [6]
 Even if Reuland had made his statement for reasons other than profit, it would still be unprotected by the First Amendment because it was knowingly or recklessly false. However, Reuland's financial interest in sales of his novel highlights the risk of protecting such false speech by public employees. The conflict of interest between Reuland as an author and the interests of the District Attorney's Office in preserving its reputation for reducing crime and for honesty is a serious one and a further reason for allowing that office to discipline an employee who behaves as Reuland did
 
 
 [7]
 Parody, unlike hyperbole, is "a literary style." Webster's Third New International Dictionary 1643 (unabridged ed.1981). A parody is chiefly a vehicle for ideas and involves speech that cannot "reasonably [be] interpreted as stating actual facts about the [subject of the parody]."Hustler, 485 U.S. at 50, 108 S.Ct. 876. As a consequence, it is entitled to First Amendment protection. Id. at 50, 108 S.Ct. 876.
 
 
 [8]
 It follows, of course, that, because I believe that no clearly established right of Reuland's was violated, Hynes would be entitleda fortiori to qualified immunity. Mandell v. County of Suffolk, 316 F.3d 368, 385 (2d Cir.2003) (discussing the standard for qualified immunity). I will add only that it was clearly not unreasonable for Hynes to believe that the "more . . . than anyplace else" statement was recklessly false, particularly after Reuland could provide no factual basis for it.