[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 21, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-11967

_____

D.C. Docket No. 04-02028-CV-CC-1

CLARINDA BOYCE,
KATINA ROBINSON,

Plaintiffs-Appellees,

versus

GWENDOLYN ANDREW,
KATHERINE HERREN,
GLENDA MCMILLAN,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(December 21, 2007)**

Before BIRCH and PRYOR, Circuit Judges,  and NANGLE,[*] District Judge.

_____

[*]Honorable John F. Nangle, United States District Judge for the Eastern  District of
Missouri, sitting by designation.

PER CURIAM:

This interlocutory appeal from the denial of qualified immunity to supervisors in a county Department of Family and Children Services ("DFCS") requires us to determine if internal complaints about caseloads are constitutionally protected public speech that shield the employees from termination or transfer. The district judge determined that case managers who complained regarding their caseloads had raised a public concern encompassed by the First Amendment. We REVERSE and REMAND.

## I. BACKGROUND

Dekalb County DFCS ("Dekalb DFCS"), a component of the Georgia Department of Human Resources ("DHR") Division of Family and Children Services, is responsible for investigating and supervising cases involving child welfare and abuse in Dekalb County. Plaintiffs-appellees, Clarinda Boyce and Katina Robinson, were Social Services Case Managers, or case workers, in the Child Protective Services ("CPS") Investigations Unit of Dekalb DFCS. Boyce was employed from December 2002 until April 9, 2004, when she was terminated for performance deficiencies. Robinson, hired in May 2003, remains employed at Dekalb DFCS, but she was transferred on March 1, 2005, from the CPS Investigations Unit to the Telephone Intake Unit because of her deficient

2

performance.

Defendants-appellants were in management/supervisory positions at Dekalb County DFCS during the relevant time. Defendant-appellant Gwendolyn Andrew, formerly a case manager, was promoted to Social Services Supervisor for CPS investigations on December 1, 2003. She supervised Boyce for approximately four months and Robinson for approximately fifteen months. Andrew assigned cases as well as monitored and supervised investigations for CPS. Defendant-appellant Katherine Herren, an employee of DHR, was assigned to Dekalb DFCS as Acting Social Services Director. She was responsible for administering the child welfare programs, identifying problems, and making needed changes. Defendant-appellant Glenda McMillan was employed at Dekalb DFCS as the Social Services Administrator, but she has not been employed by Dekalb DFCS since June 30, 2004. Walker Solomon, II, was the Director of Dekalb DFCS.

CPS is the unit of DFCS that is responsible for making the initial contact and investigation of allegations of child abuse or neglect. Case managers are required to respond to such allegations within twenty-four hours or five days, depending on the nature of the allegation. Thereafter, the CPS investigations case manager assesses the environment and submits the case for closure within thirty days. In addition to the initial contact with the family and child, the investigation includes

3

additional necessary contacts, and submission of required forms. A case is considered closed or terminated when all necessary contacts have been completed and all required forms submitted. If contact needed to be maintained or DFCS needed to monitor the situation, the case was referred to the Ongoing Services Unit of CPS, a different unit of DFCS. During 2003 and 2004, supervisors expected case managers to close at least four cases a week.

For the period 2002-2004, DFCS experienced difficulties in maintaining caseloads of all of its case managers because of extremely high caseloads and turnover in employees.[1] To address the high caseloads, DFCS case managers used several methods. Case managers were allowed to "come off rotation," which meant that the case manager was skipped for a new assignment in the rotation

---

[1] In his order, the district judge described this situation at Dekalb DFCS, while Boyce and Robinson were case managers:

> Multiple problems existed in CPS Investigation during Boyce and Robinson's tenure. The unit was understaffed. Attrition was high. Management was in flux and temporary employees handled much of the work. Child Welfare League of America guidelines recommend that a case manager carry between 12 and 15 cases at one time. In October of 2003, Dekalb DFCS case managers had an average of 30 to 35 cases. In December of 2004, the average case manager had 35 to 40 cases. Three children in DFCS died in 2002. Three more died in 2003. In October of 2003, DHR sent a team of three management level employees to Dekalb DFCS, instructing them to identify and address existing problems.

R2-29 at 3.

wheel so that the case manager would have additional time to close his or her existing caseload before the assignment of new cases. Additionally, case managers were given overtime to complete additional work outside normal working hours; temporary employees were hired and assigned to assist case managers; various dictation systems were employed to assist in finalizing reports; and employees were assigned to the Dekalb office from the state DFCS office to monitor caseloads.

Boyce and Robinson complained to their supervisors about the size of their caseloads. Primarily, these complaints were electronic mails sent to their supervisors. Boyce and Robinson also used an "Assignment Despite Objection" or "ADO" form provided by their union to advise an employer without being insubordinate of the amount of work that had been assigned and to notify the employer that it was too much to handle.

During 2003 and 2004, Boyce complained to her supervisors, management, and her union that her caseload of more than fifty cases was too high. She gave three ADO forms to Herren and McMillan. From September 2003 until January 2004, Boyce was asked to come off rotation so that she could devote more time to investigating and closing cases. Management also reassigned some of her cases. During this time, however, Boyce closed no cases, which she represents was

5

because she had to spend more time in court on other assignments.

From the outset of her four months of supervision, Andrew had difficulty with Boyce's not being able to close cases. On March 4, 2004, Andrew assigned her four new cases. Boyce returned the case files to Andrew and told her that she would not take any new cases. Andrew complained to DeKalb DFCS management, and Boyce received a reprimand letter from Solomon, to which she responded by a letter characterizing her exchange with Andrew as a "frustrated outburst." Boyce Dep. at 109. In describing her stress and frustration with her high caseload, Boyce said: "Just really overwhelming feeling that you're going to wake up and a child's going to be injured or dead as a result of you not being able to help that family, help that child."[2] Id. at 84.

McMillan placed Boyce on a work performance plan with deadlines for closing out fifty-one cases that were at least ninety days overdue.[3] Because Boyce

---

[2] Andrew, Boyce's direct supervisor, did not recall that Boyce expressed any concern for the welfare of the children for whom she was responsible. Andrew Dep. at 28. Similarly, McMillan, the supervisor for the investigations unit and Boyce's intermediate supervisor, testified that Boyce "never verbalized" to her that children were at risk because case managers were not given sufficient time to investigate cases. McMillan Dep. at 24. When Herren, the Acting Social Services Director at Dekalb DFCS, was asked if Boyce discussed with her concerns about children's lives being put in danger because of the caseload management, she responded: "She did not discuss with me any concerns about child safety." Herren Dep. at 54 (emphasis added).

[3] Andrew testified that Boyce "just basically was not producing," Andrew Dep. at 23, "[a]pproximately 80 percent" of her cases "were not being submitted timely," id. at 26. McMillan testified that Boyce was "delayed in producing the work," and "there was missing documentation from the record to indicate what work was done." McMillan Dep. at 19. Herren

6

failed to meet the deadlines of her performance plan, Andrew and McMillan recommended to Solomon that she be terminated.[4] They were advised that her termination had been approved by the state office on April 7, 2004.

The same day, Dr. Janet Olivia, Director of DFCS, visited Dekalb DFCS.[5] During the meeting with Dr. Olivia and the entire staff, Boyce asked whether the state had developed a system to alert DHR when a case manager had been assigned too many cases; whether the Governor's office had instituted certification requirements for case mangers; and whether there were any checks and balances in place as to the assignment of cases before a crisis occurred, such as the death of a child. She also stated that lack of communication and low morale contributed to the deaths of children in DFCS care, that generally case managers were not getting help, and that Dekalb DFCS appeared to be ineffective.

After the meeting, Boyce was notified of her dismissal. Defendants-

---

testified that Boyce's work was not satisfactory, and, as an example, explained that she had disagreed with Boyce's recommendation to continue a case for longer than 30 days. Herren Dep. at 46-47. Herren's concerns with Boyce's work as to her caseload, which was consistent with other case managers, was her case management generally and her inability to meet deadlines and close cases. Id. at 49-50.

[4] The recommendation for Boyce's termination occurred after she had been placed on a work plan with "a number of discussions about [her] progress before there was a decision made about termination." McMillan Dep. at 22. "Her performance on her work plan is what led to her termination." Id. at 26.

[5] Dr. Olivia additionally served in the capacity of special advocate to the Commissioner. Andrew Dep. at 38. Andrew testified that the open meeting with Dr. Olivia included "practically everybody in child welfare." Id.

appellants maintain that her termination had nothing to do with her outspokenness at the meeting, because Andrew and McMillan had presented Boyce's lack of productivity to personnel before Dr. Olivia's meeting with the Dekalb DFCS staff, and her termination had been approved prior to the meeting. The undisputed evidence shows that Herren was not involved in the decision to terminate Boyce.

Robinson complained to her supervisors verbally and by electronic mail concerning her burdensome caseload, mismanagement, and child safety. She submitted at least seven ADOs in which she objected to her high caseload and requested help.[6] Generally, Robinson's work-related complaints were that she was

---

[6] In six of her ADOs, Robinson's handwritten explanation is identically worded with the only distinctions being the number of cases that she was handling contrasted with the recommended standard of 15 by the Child Welfare League of America and the number of cases in which she had been unable to contact the child:

> I am currently at a dangerously high caseload. I have repeatedly requested help with this situation; however I have not been given enough time to process and investigate the cases on my enormously high caseload. I am once again making the agency aware of this situation. There are 20 cases that I have not been able to make any type of contact with the child.

Robinson Dep. Exh. 7, Mar. 2, 2004 ADO (74 cases); Feb. 23, 2004 ADO (66 cases, 11 cases with no child contact); Feb. 23, 2004 (65 cases, 10 cases with no child contact); February 20, 2004 (64 cases, 9 cases with no child contact); Feb. 19, 2004 (63 cases, 9 cases with no child contact).

Robinson's sixth ADO in the record has the following handwritten explanation concerning her 63 pending cases:

> On February 10, 2004 I sent correspondence to my supervisor Gwen Andrews and social services administrator Glenda McMillan alerting them that my case load is currently extremely high and I have not been able to make contact with 19 Families. I have now a total of 13 cases including the one that was assigned to me today that have not been responded to. I am requesting more time off of

continuously receiving new cases without processing the old cases that she had; she was not able to meet response times because of the caseload; and, because she was in court on cases, she was not adequately supervised; she had been subjected to supervisors with inconsistent management styles; and she did not want to receive new cases because she was uncomfortable with not being able to process the cases that she already had been assigned. Robinson also complained to McMillan that her caseload was high and that all of her caseload was not accurately reflected on case management lists, although she did not know why they were not listed. Generally, she contended that her high caseload impacted negatively on the safety of children in care of Dekalb DFCS.

Robinson argues that she was subjected to retaliation by her supervisors at Dekalb DFCS because of reporting her high caseload and mismanagement. When Andrew met with Robinson to discuss her cases, they met one on one, whereas Robinson states that Andrew met with other case managers as a group. Robinson further contends that Andrew gave her inconsistent instructions concerning meeting with families. Robinson additionally believed that the delay in assistance

---

rotation to attend to this issue and to work the other 50 cases and bring some type of closure to these cases that date back to October 2003.
I was off rotation Feb 10, 2004-Feb 13; however that is not enough time to attend to the families that I have not seen and continue to work on all other cases on my case load. I am once again requesting help with this situation.

Id. Feb. 17, 2004 ADO.

that she received on her caseload was because of her conversation with McMillan.

Robinson also received a reprimand from Mildred Hart, the Social Services

Administrator, which Solomon, as Director of Dekalb DFCS, later rescinded.

Robinson's October 2004 performance evaluation stated that she did not meet

expectations in one category. While the evaluation was changed subsequently to

show that she met expectations, Robinson objected to the use of whiteout to make

the correction; Robinson ultimately received an evaluation of meeting expectations

for the period covered by the evaluation. Robinson initially was denied her request

for eighty hours of sick leave, which later was approved after she provided medical

documentation of her need for gallstone surgery.

On October 21, 2004, and November 23, 2004, Robinson requested that she

be transferred to another unit because of her difficulties in dealing with Andrew.[7]

---

[7] Robinson's November 23, 2004, electronic mail to Herren states:

> Due to ongoing disturbances and abuse by Ms. Andrew, I am
> requesting to be transferred to another unit or department. I am
> requesting that the agency accommodate my request.

R1-18 at Robinson Dep. Exh. 9. Herren forwarded Robinson's electronic mail to Hart, who
responded to Robinson:

> I received a[n] email from you on 10/21/04 with the same request.
> I advised you at that time to present documenting of the
> disturbances and abuse cause[d] by Ms. Andrew. To date I have
> not received anything from you regarding Ms. Andrew. I am more
> than willing to address any issue you are having with your
> supervisor. However, you must provide me with the
> documentation.

On February 15, 2005, Solomon notified Robinson that she was approved to transfer to the Telephone Intake Unit effective March 1, 2004, although her requested transfer resulted in a five percent reduction of her monthly salary because of losing the county supplement paid to employees of CPS. The record does not show that either Andrew or Herren was involved directly in the decision to transfer Robinson, and her transfer occurred after McMillan had left the employment of Dekalb DFCS.[8]

Boyce and Robinson filed a 42 U.S.C. § 1983 action against their DFCS supervisors, Andrew, McMillan, Herren, and Solomon,[9] and alleged that Boyce's

---

Id.

[8] The district judge also described the supervisor defendants-appellants' view of Robinson's work and complaints:

> Defendants maintain that Robinson was unproductive, failed to return telephone calls, and failed to appear for appointments. Defendants further contend that clients complained that Robinson threatened to eliminate their food stamp allotments and in certain situations, to call police. Defendants state that they provided Robinson with resources, time off rotation, the chance to work over-time for pay, and assisted with time and caseload management. Defendants also removed 80 cases from Robinson's caseload when Robinson returned from sick leave.

R2-29 at 13.

[9] Solomon was a defendant in the district court. The district judge granted him summary judgment because suit against him in his official capacity is a suit against the local government entity, or Dekalb DFCS. Hafer v. Melo, 502 U.S. 21, 25, 112 S.Ct. 358, 361 (1991); Vineyard v. County of Murray, Ga., 990 F.2d 1207, 1210 n.3 (11th Cir. 1993) (per curiam). Therefore, Solomon is no longer a party in this case.

termination and Robinson's transfer were retaliation for their protected First Amendment speech. In analyzing defendants' summary judgment motion, the district judge determined that Boyce and Robinson's concerns over child safety being sacrificed because of their high caseloads and mismanagement problems at Dekalb DFCS were matters of public concern.[10] He also concluded that Boyce and Robinson were subjected to adverse employment actions because they spoke out on these matters of public concern.[11] The district judge concluded that Boyce and Robinson were whistleblowers and that defendants had fair warning that their actions could subject them to liability for alleged violation of a First Amendment right. Accordingly, he denied defendants qualified immunity, which they

---

[10] In determining that Boyce and Robinson had spoken concerning issues of public concern, the district judge concluded that "the public has a strong interest in knowing that children caught within the Dekalb DFCS system are not necessarily safe. The public also has an interest in knowing that government officials are trying to make it appear that services at Dekalb DFCS are improving, when they are not." R2-29 at 20.

[11] As a result of Boyce and Robinson's alleged public-interest speech, the district judge determined that their supervisors retaliated against them:

> Boyce and Robinson were struggling with very large caseloads. Both plaintiffs told their supervisors and others that they could not adequately serve each family in their caseload because they had too many cases. Subsequent to and concurrent with those statements, Boyce and Robinson were subject to what they allege to be management's harassing, intimidating, and retaliatory actions. Management's most salient actions against Robinson and Boyce are the reprimand and termination of Boyce and the reprimand and transfer of Robinson.

R2-29 at 17.

12

challenge on interlocutory appeal.

## II. DISCUSSION

A. <u>Qualified Immunity Analysis</u>

"Qualified immunity allows government employees to carry out their discretionary duties without fear of litigation, 'protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law.'" <u>Mercado v. City of Orlando</u>, 407 F.3d 1152, 1156 (11th Cir. 2005) (citation omitted). A government employee acted within his or her discretionary authority if objective circumstances show that the challenged actions occurred in the performance of the employee's duties "and within the scope of this authority." <u>Hill v. Dekalb Reg'l Youth Det. Ctr.</u>, 40 F.3d 1176, 1185 n.17 (11th Cir. 1994). In analyzing the affirmative defense of qualified immunity, we use a two-part inquiry: (1) do the alleged facts show that the government actor violated a constitutional right? and (2) was that constitutional right clearly established? <u>Saucier v. Katz</u>, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156 (2001). "The relevant, dispositive inquiry" for determining clearly established law is whether a reasonable government employee's conduct was clearly unlawful in the situation confronted. <u>Id.</u> While "[t]he law is clearly established that an employer may not demote or discharge a public employee for engaging in protected speech," <u>Travers v. Jones</u>, 323 F.3d

13

1294, 1295 (11th Cir. 2003) (per curiam) (citing Rankin v. McPherson, 483 U.S. 378, 383, 107 S.Ct. 2891 (1987)), the *threshold inquiry* for deciding if qualified immunity is appropriate is *determining under First Amendment, government-speech law whether there has been a constitutional violation by the government employer.*

B. First Amendment Inquiry

Government regulation of employees' speech differs from its regulation of the speech of its citizenry. Connick v. Myers, 461 U.S. 138, 140, 103 S.Ct. 1684, 1686 (1983); Pickering v. Board of Educ. of Twp. High Sch. Dist. 205, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734 (1968). Acting as an employer, the government is afforded broad discretion in its employment decisions. Johnson v. Clifton, 74 F.3d 1087, 1092 (11th Cir. 1996). For a government employee's speech to have First Amendment protection, it was well settled by the Supreme Court in Connick and Pickering that the employee must have (1) spoken as a citizen and (2) addressed matters of public concern. Following this "directive," we have recognized that we must determine "whether the speech at issue was made primarily in the employee's role as citizen, or primarily in the role of employee." Kurtz v. Vickrey, 855 F.2d 723, 727 (11th Cir. 1988). The Supreme Court has clarified and simplified this inquiry by holding that "when public employees make

14

statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Garcetti v. Ceballos, __ U.S. __, __, 126 S.Ct. 1951, 1960 (2006).

In Garcetti, a Los Angeles County deputy district attorney wrote two disposition memoranda recommending dismissal of the charges in a case, in which his research revealed that a search warrant affidavit contained misrepresentations. A meeting involving the deputy district attorney, his supervisors, and employees of the Los Angeles County Sheriff's Department, which allegedly became heated, was conducted to discuss the search warrant affidavit. Despite the concerns expressed by the deputy district attorney, the decision was made to proceed with the prosecution. He was called by the defense regarding the alleged misrepresentations at a hearing, but the trial judge rejected the challenge to the search warrant. The deputy district attorney subsequently was transferred from his calendar deputy position to a trial deputy position at another courthouse. He sued under § 1983 and alleged that his change in job and location were retaliation for his speech; the Ninth Circuit agreed, and the Supreme Court reversed.

Garcetti instructs that "[t]he proper inquiry is a practical one." Id. at __, 126 S.Ct. at 1961. Focusing on the "citizen" aspect of the First Amendment

15

analysis, the Court determined that the research and memoranda were part of the deputy district attorney's official duties. Since his findings and recommendation were "pursuant to" his official duties, he was not speaking as a citizen under the First Amendment. Id. at __, 126 S.Ct. at 1960. The Court determined that "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." Id.

Following Garcetti, our circuit has modified the analysis of the first step of the Pickering test for analyzing alleged government employer retaliation to determine if an employee's speech has constitutional protection by deciding at the outset (1) if the government employee spoke as an employee or citizen and (2) if the speech addressed an issue relating to the mission of the government employer or a matter of public concern. D'Angelo v. School Bd. of Polk County, Fla., 497 F.3d 1203, 1209 (11th Cir. 2007).[12] To qualify as constitutionally protected speech

---

[12] Following Pickering, our analysis of retaliation against an employee by a government employer for alleged constitutionally protected speech has been comprised of four parts:

> To prevail under this analysis, an employee must show that: (1) the speech involved a matter of public concern; (2) the employee's free speech interests outweighed the employer's interest in effective and efficient fulfillment of its responsibilities; and (3) the speech played a substantial part in the adverse employment action. If an employee satisfies her burden on the

in the First Amendment, government employment retaliation context that warrants the Pickering analysis, as Garcetti has specified, the speech must be made by a *government employee speaking as a citizen and be on a subject of public concern.* See Phillips v. City of Dawsonville, 499 F.3d 1239, 1242 (11th Cir. 2007) (per curiam) (concluding in a First Amendment, retaliation case following Garcetti that the government employee "was speaking in accord with her duty as the City Clerk and not as a private citizen"); Vila v. Padrón, 484 F.3d 1334, 1339 (11th Cir. 2007) (acknowledging after Garcetti that, to analyze a First Amendment, retaliation claim for speech by a government employee, "[t]he threshold question is whether [the government employee] spoke as a citizen on a matter of public concern"); Mills v. City of Evansville, Ind., 452 F.3d 646, 647-48 (7th Cir. 2006) (recognizing that "[o]nly when a government employer penalizes speech that a plaintiff utters 'as a citizen' must the court consider" the Pickering analysis). If the government employee, however, was speaking as an employee, then there can be no First Amendment issue, and the constitutional inquiry ends with no consideration of the Pickering test. See Mills, 452 F.3d at 647 ("Garcetti . . . holds that before asking

---

> first three steps, [(4)] the burden then shifts to the employer to
> show by a preponderance of the evidence that it would have made
> the same decision even in the absence of the protected speech.

Cook v. Gwinnett County Sch. Dist., 414 F.3d 1313, 1318 (11th Cir. 2005). The first two parts are questions of law, and the last two parts are questions of fact. Id.

17

whether the subject-matter of particular speech is a topic of public concern, the court must decide whether the plaintiff was speaking 'as a citizen' or as part of her public job." (emphasis added)). Therefore, "[t]he Pickering balance is not triggered unless it is first determined that the employee's speech is constitutionally protected." Ferrara v. Mills, 781 F.2d 1508, 1513-14 (11th Cir. 1986).

"A court must therefore discern the purpose of the employee's speech—that is, whether she spoke on behalf of the public as a citizen, or whether the employee spoke for herself as an employee." Morgan v. Ford, 6 F.3d 750, 754 (11th Cir. 1993) (per curiam). Importantly, "the interests of the [government employee], as a citizen, in commenting upon matters of public concern" must be balanced with "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568, 88 S.Ct. at 1734-35. Therefore, "in the First Amendment context, courts review restrictions on employees' speech with greater deference in order to balance the government employer's legitimate interests in its mission." Engquist v. Oregon Dep't of Agric., 478 F.3d 985, 995 (9th Cir. 2007) (citing Garcetti, __ U.S. at __, 126 S.Ct. at 1960). Accordingly, we initially must decide whether Boyce and Robinson spoke as government employees or as citizens.

18

Deciding whether a government employee's speech relates to his or her job as opposed to an issue of public concern "must be determined by the content, form, and context of a given statement, as revealed by the whole record." Connick, 161 U.S. at 147-48, 103 S.Ct. at 1690.

As case managers for Dekalb DFCS, Boyce and Robinson's job was to investigate the cases of children allegedly at risk and to make recommendations to their supervisors. Both failed to meet their case quotas. In their respective electronic mails to supervisors and union ADOs, each claimed to be overworked and commented that children could be mistreated or could die because Boyce and Robinson were unable to handle all the cases assigned to them. Other than mentioning the six children that had died previously, and who are not at issue in this case, neither specifically identifies a single child who was in danger.

The form and context in which the complaints by Boyd and Robinson were made are indicative of the fact that they intended to address only matters connected with their jobs at Dekalb DFCS. Verbal, electronic mail, and ADO complaints by Boyd and Robinson to their supervisors focus on their respective views that their caseloads were too high, which caused each not to meet expected deadlines, and their consequent need for assistance. Robinson's complaints, although more often in a written format as a letter or memorandum to a

19

supervisor, were not sent to an outside entity, like the teacher's letter to a newspaper in Pickering, and did not address any subject not personal to her working conditions at Dekalb DFCS; she reiterated her same personal issues about which she complains in her electronic mail communications with her supervisors.

We have determined that a police report generated in the "normal course of [the plaintiff's] duties" was not speech on a matter of public concern, although it contained information unfavorable to the police department. Morris v. Crow, 142 F.3d 1379, 1382 (11th Cir. 1998) (per curiam). "The fact that such information may be of general interest to the public, however, does not alone make it of 'public concern' for First Amendment purposes." Id. at 1381. "To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case." Connick, 461 U.S. at 149, 103 S.Ct. at 1691.

Boyce additionally relies on statements that she made at the April 7, 2004, staff meeting attended by Dekalb DFCS employees and a state supervisor. Specifically, she asked whether there was any system in place to alert the state office that a case manager had been assigned too many cases; whether the Governor's office was going to require that DFCS case workers be certified;

20

whether there were checks and balances in place regarding assignment of cases before a crisis occurred, such as the death of a child; and generally complained that no one was helping case managers with their cases. These questions asked in an open staff meeting, like her other communications with her immediate supervisors, concern her personal working conditions without reference to any particular family, child, or case. Significantly, this speech by Boyce occurred after she had been reprimanded and placed on a performance plan because of performance issues raised by Andrew, McMillan, and Solomon and after her dismissal had been recommended by Andrew and McMillan, and approved by Solomon. Therefore, her remarks at the meeting could not have been an instigating factor in the employment decisions of any of her defendant supervisors. Additionally, the undisputed evidence in the record is that Herren was not involved in Boyce's dismissal.

A "public employee may not transform a personal grievance into a matter of public concern by invoking a supposed popular interest in the way public institutions are run." Ferrara, 781 F.2d at 1516. "[T]he relevant inquiry is not whether the public would be interested in the topic of the speech at issue but rather is 'whether the purpose of the [the plaintiff's] speech was to raise issues of public concern.'" Maggio v. Sipple, 211 F.3d 1346, 1353 (11th Cir. 2000) (quoting

21

Morgan, 6 F.3d at 754) (alteration in original); see Renfroe v. Kirkpatrick, 722 F.2d 714, 715 (11th Cir. 1984) (per curiam) ("[P]laintiff's reference to the students' welfare during her oral presentation to the Board is not sufficient to bring her grievance within the rubric of matters of 'public concern.'"). The safety of children under DeKalb DFCS care is the issue of paramount importance to the purpose of the agency; it is intertwined with each act of a case manager and impacts every aspect of the performance of a case manager's job. The record in this case reveals that the speech of Boyce and Robinson, while ostensibly intermingled with issues of child safety and Dekalb DFCS mismanagement, was not intended to address matters of public concern from the perspective of a citizen. See White Plains Towing Corp. v. Patterson, 991 F.2d 1049, 1059 (2d Cir. 1993) (recognizing that "[e]ven as to an issue that could arguably be viewed as a matter of public concern, if the employee has raised the issue solely in order to further his own employment interest, his First Amendment rights to comment on that issue is entitled to little weight" (citing Connick, 461 U.S. at 154, 103 S.Ct. at 1694)).

Boyce and Robinson's speech addressed personal grievances and frustrations with their jobs as case managers at Dekalb DFCS, which they viewed to be the result of mismanagement of internal administrative affairs generally with no specific incidents of alleged false reporting or documentation. "When a public

employee speaks pursuant to employment responsibilities, . . . there is no relevant analogue to speech by citizens who are not government employees." Garcetti, __ U.S. at __, 126 S.Ct. at 1961. "Our responsibility is to ensure that citizens are not deprived of fundamental rights by virtue of working for the government; this does not require a grant of immunity for employee grievances not afforded by the First Amendment to those who do not work for the State." Connick, 461 U.S. at 147, 103 S.Ct. at 1690.

Importantly, as the Court held in Connick, "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." 461 U.S. at 147, 103 S.Ct. at 1690 (emphasis added); see Vila, 484 F.3d at 1339 ("When a public employee speaks as an employee on matters of personal interest and not as a citizen upon matters of public concern, the First Amendment is not implicated."). Government employers have "heightened interests in controlling speech made by an employee in his or her professional capacity," because they "must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the

employer's mission." Garcetti, __ U.S. at __, 126 S.Ct. at 1960. In this case, Boyce and Robinson's complaints and excuses about their workloads were concerning and disruptive for their supervisors because the mission of Dekalb DFCS, to investigate and make recommendations concerning children reportedly in danger, was not being accomplished.

Boyce and Robinson's supervisors had made some adjustments in their respective workloads, but those measures did not resolve the problem. When it became apparent to Robinson that she still could not meet her case review quota, she requested a transfer, which was granted by her supervisors. Boyce's written and verbal complaints about her workload and the lack of help, as well as her remarks expressed in an open staff meeting, were in stark contrast to the mission of the Dekalb DFCS office and confirmed that her termination was the correct decision. See Connick, 461 U.S. at 153, 103 S.Ct. at 1693 ("'When a government employee personally confronts his immediate superior, the employing agency's institutional efficiency may be threatened not only by the content of the employee's message but also by the manner, time, and place in which it is delivered.'" (citation omitted)). "[T]he First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities." Garcetti, __ U.S. at __, 126 S.Ct. at 1961. The Supreme

24

Court's decisions in the First Amendment speech/government employment area reflect "the common-sense realization that government offices could not function if every employment decision became a constitutional matter." Connick, 461 U.S. at 143, 103 S.Ct. at 1688. Consequently, "government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." Id. at 146, 103 S.Ct. at 1690.

Significantly, Boyce and Robinson were complaining to their superiors as employees about their workloads for a work reason: they wanted to have their caseloads reduced or to receive help with their work. The purpose of their grievances clearly was not to raise public awareness about children within the care of Dekalb DFCS. If that had been their intention, then they would have identified the children who were in danger. Other Dekalb DFCS case managers supervised by the same superiors during the relevant time did not join in Boyce and Robinson's § 1983 action.[13] The record shows that this was an internal employee matter and that Boyce's termination and Robinson's transfer were internal decisions by their supervisors to accomplish the work of Dekalb DFCS.[14] "[T]he

---

[13] During the relevant time, Dekalb DFCS was experiencing difficulties in handling its ongoing caseload for various reasons. Dedicated government employees generally work with their supervisors to get through such times and to maintain the work rather than working against them.

[14] The amount of time and effort that Boyce and Robinson spent complaining and registering their personal work grievances would have been better spent doing their case

25

First Amendment does not require a public office to be run as a roundtable for employment complaints over internal office affairs." Connick, 461 U.S. at 149, 103 S.Ct. at 1691.

Based upon review of the entire record, Boyce and Robinson "primarily spoke" as employees "to improve [their] work environment"; they represent that they were overworked and overwhelmed. Morgan, 6 F.3d at 755. As in Garcetti, the "controlling factor" was that their expressions were made pursuant to official duties, id. at __, 126 S.Ct. at 1959, and "the main thrust of [their] speech took the form of a private employee grievance," Morgan, 6 F.3d at 755. Moreover, Boyd and Robinson's cases necessarily were reassigned to others; Boyce was terminated, and Robinson was transferred to another Dekalb DFCS unit, Telephone Intake, at her request. Therefore, other Dekalb DFCS employees assumed their responsibilities.

Because Boyce and Robinson spoke as government employees about their jobs and not as citizens, they have "no First Amendment cause of action based on [their] employer's reaction to the speech," and there is no need to engage in the

---

investigation jobs, which would have reduced the large caseload handled by the Dekalb DFCS office. Essentially, if they were not performing their jobs, then their supervisors, whose focus is on accomplishing the work of the office, needed to make necessary changes to achieve the mission of Dekalb DFCS.

Pickering balancing analysis.[15]  Garcetti, __ U.S. at __, 126 S.Ct. at 1958.  With

no constitutional right upon which to base Boyce and Robinson's § 1983 case,

their Dekalb DFCS supervisors, Andrew, McMillan, and Herren, are entitled to

qualified immunity.  See Anderson v. Burke County, 239 F.3d 1216, 1221 (11th

Cir. 2001) (per curiam) (granting qualified immunity to employer where

employees asserted issues of understaffing and policies that affected the operation

of county 911 system).  Because Boyce and Robinson have not shown a First

Amendment, retaliation cause of action concerning their supervisors for these

employees' speech regarding their jobs, we reverse the denial of qualified

---

[15] To the extent that Boyce and Robinson characterize themselves as whistleblowers, a "'core concern' of the First Amendment" for those "who report government wrongdoing," our First Amendment analysis shows that this theory of relief is unavailing.  Akins v. Fulton County, Ga., 420 F.3d 1293, 1304 (11th Cir. 2005) (quoting Bryson v. City of Waycross, 888 F.2d 1562, 1566 (11th Cir. 1989)).  In criticizing their superiors' management of the important work of Dekalb DFCS, Boyce and Robinson have made allegations regarding only Andrew, McMillan, and Herren's acting as supervisors in managing the case work during the relevant time, but they have not demonstrated wrongdoing or corruption by these supervisors.  In similar situations following Garcetti of government employees' challenging their terminations because they reported alleged wrongdoing in government offices, our court determined that commentary by government employees concerning alleged wrongdoing in a government office was related to the government employees' jobs and, therefore, they were not speaking as private citizens for the purpose of First Amendment, retaliation claims.  See Phillips, 499 F.3d at 1241-43 (upholding summary judgment for the city defendants against First Amendment, retaliation allegations by deciding that the City Clerk, whose position gave her control and accountability for city funds, was acting within the scope of her duties when she reported that the mayor was improperly charging the city for his personal expenses, and the City Clerk subsequently was not reappointed by the City Council); Vila, 484 F.3d at 1339 (affirming judgment as a matter of law for college president over First Amendment, retaliation charges by Vice President of External Affairs, whose employment contract was not renewed following her reports of illegal and unethical conduct by college president because her allegations "fall squarely within her official job duties and are not protected by the First Amendment" (citing Garcetti, __ U.S. __, 126 S.Ct. at 1960)).

27

immunity to Andrew, McMillan, and Herren.

## III. CONCLUSION

In this interlocutory appeal, government supervisor defendants-appellants Andrew, Herren, and McMillan have challenged their being denied qualified immunity for the respective termination and transfer of plaintiffs-appellees Boyce and Robinson, both of whom formerly were case managers at Dekalb DFCS. The district judge denied qualified immunity to the supervisors because he determined that Boyce and Robinson's complaining about their caseloads was a matter of public concern, which afforded them First Amendment protection and that Boyce's termination and Robinson's transfer were retaliation by defendants-appellants. As we have explained, the First Amendment does not protect government employees when they speak as employees as opposed to citizens. Because the matters discussed by Boyce and Robinson were internal government work matters at Dekalb DFCS, Andrew, Herren, and McMillan are entitled to qualified immunity. We **REVERSE** the denial of qualified immunity by the district judge and **REMAND** for the district judge to grant Andrew, Herren, and McMillan qualified immunity and to dismiss this case against them.

BIRCH, Circuit Judge, concurring specially:

While I agree with the result in this case, pursuant to Garcetti v. Ceballos, __ U.S. __, 126 S.Ct. 1951 (2006), I would implement a five-part Garcetti/Pickering[1] analysis in First Amendment, retaliation cases in our circuit. Garcetti neither overruled Pickering nor is it a "stand alone" decision. Evidenced by the use of Pickering and its successors throughout the Garcetti analysis, the Court augmented and clarified step one of the Pickering constitutional analysis. Garcetti, __ U.S. at __-__, 126 S.Ct. at 1955-62. That is, in Garcetti, the Court has instructed lower federal courts *first* to classify or categorize the government speaker as an employee or a private citizen. If the government employee is speaking as an employee, then there is no need to engage in the Pickering constitutional analysis of deciding whether the government employee has spoken as a citizen on a matter of public concern. Consequently, Garcetti has given lower federal courts a distinction in analysis that expedites review of First Amendment, retaliation cases involving government employees.

Following Garcetti, other circuits have transformed their Pickering four-part test for determining whether a government employer has retaliated against an employee for constitutionally protected speech into a five-part test or a Pickering

---

[1] Pickering v. Board of Educ. of Twp. High Sch. Dist. 205, 391 U.S. 563, 88 S.Ct. 1731 (1968).

29

step one with two subparts, which expedites the analysis by determining at the outset whether the plaintiff is speaking as a government employee or as a private citizen. The Tenth Circuit has transitioned from the four-part Pickering test to the five-part "Garcetti/Pickering" test. Brammer-Hoelter v. Twin Peaks Charter Acad., 492 F.3d 1192, 1202-03 & n.4 (10th Cir. 2007). Under the Garcetti/Pickering test, the *first step* is judicial determination of "whether the employee speaks 'pursuant to [his] official duties.'" Id. at 1202 (quoting Garcetti, __ U.S. at __, 126 S.Ct. at 1960). "If the employee speaks pursuant to his official duties, then there is no constitutional protection because the restriction on speech 'simply reflects the exercise of employer control over what the employer itself has commissioned or created.'" Id. (quoting Garcetti, __ U.S. at __, 126 S.Ct. at 1960); see Reuland v. Hynes, 460 F.3d 409, 415 n.5 (2d Cir. 2006) (following Garcetti, "*before* an employee's speech is entitled to First Amendment protection, we must also determine that he was not speaking pursuant to his duties as an employee") (emphasis added)), cert. denied, __ U.S. __, 128 S.Ct. 119 (2007). If the employee did not speak relative to his official duties but as a citizen, then the second part of the Garcetti/Pickering test requires judicial determination of "whether the subject of the speech is a matter of public concern." Brammer-Hoelter, 492 F.3d at 1202. "If the speech is not a matter of public concern, then

30

the speech is unprotected and the inquiry ends." Id. at 1203.

Our sister circuits concluded that, in Garcetti, the Court delineated the analysis of the first part of a First Amendment, retaliation case under the four-part test by dividing it into two parts. Instead of Pickering step one, which was the determination of whether the government employee's speech was a matter of public concern, under the Garcetti/Pickering test, the first judicial determination is the classification or category of the government speaker: employee or citizen. Deciding if the government employee spoke as an employee necessarily involves determining the job responsibilities of the employee which then permits correlating the speech to the employee's job requirements. This determination is *separate* from progressing to Pickering step one: a determination of whether the speech concerns a matter of public interest. Therefore, the Pickering step one is not a unitary determination that incorporates the more definitive Garcetti analysis of *first* correlating a government employee's classification with his or her job responsibilities. Only if the government speaker is speaking as a citizen does the analysis progress to a judicial determination of whether the subject is a matter of public concern. If the government employee, however, was speaking as an employee, then there is no First Amendment issue, and the constitutional inquiry ends. See Ferrara v. Mills, 781 F.2d 1508, 1513-14 (11th Cir. 1986) (recognizing

31

that the Pickering balance is unnecessary unless a judicial determination has been made that the employee's speech has constitutional protection).

Judge Easterbrook has commented on the logic of this rationale for the adjustment in analysis for First Amendment, retaliation cases by government employees:

> Garcetti . . . holds that *before* asking whether the subject-matter of particular speech is a topic of public concern, the court must decide whether the plaintiff was speaking "as a citizen" or as part of her public job. Only when government penalizes speech that a plaintiff utters "as a citizen" must the court consider the balance of public and private interests, along with other questions posed by Pickering and its successors . . . .

Mills v. City of Evansville, Ind., 452 F.3d 646, 647-48 (7th Cir. 2006) (citing Waters v. Churchill, 511 U.S. 661, 114 S.Ct. 1878 (1994); Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684 (1983); Givhan v. Wester Line Consol. Sch. Dist., 439 U.S. 410, 99 S.Ct. 693 (1979)) (emphasis added). The efficiency for judicial analysis is that only when a government employer penalizes speech that a employee "utters 'as a citizen' must the court consider the balance of public and private interests"— the Pickering analysis. Mills, 452 F.3d at 648. Indeed, we have recognized the changed analysis implemented by other circuits and "refined our analysis of the first step of the Pickering test." D'Angelo v. School Bd. of Polk County, Fla., 497 F.3d 1203, 1209 (11th Cir. 2007). Consequently, circuits,

32

like ours, that have not definitively changed to a five-step Garcetti/Pickering test following Garcetti nonetheless actually engage in this five-step analysis, because we divide the first step of the Pickering test into two subparts. Id.

In Garcetti, the Court has built upon Pickering and succeeding cases to give lower federal courts a distinction in analysis that expedites review of First Amendment, retaliation cases involving government employees by *first* examining the employee's classification. This expedited analysis has been recognized at least by three circuits post-Garcetti. See Brammer-Hoelter , 492 F.3d at 1202-03 (Tenth Circuit); Reuland, 460 F.3d at 415 n.5 (Second Circuit); Mills, 452 F.3d at 647-48 (Seventh Circuit). Our circuit is using the expedited analysis following Garcetti without citing Pickering as if Garcetti is an independent decision in First Amendment, retaliation cases involving government employees. See Phillips v. City of Dawsonville, 499 F.3d 1239, 1242 (11th Cir. 2007) (per curiam) (concluding in a First Amendment, retaliation case following Garcetti that the government employee "was speaking in accord with her duty as the City Clerk and not as a private citizen" without citing Pickering or using its analysis); Vila v. Padrón, 484 F.3d 1334, 1339 (11th Cir. 2007) (acknowledging after Garcetti that, to analyze a First Amendment, retaliation claim for speech by a government employee, "[t]he threshold question is whether [the government employee] spoke

33

as a citizen on a matter of public concern" without engaging in the <u>Pickering</u> analysis or citing the case). This is not the Court's reasoning or instruction in <u>Garcetti</u>.

The utility of the <u>Garcetti/Pickering</u> analysis is evident in our cases since <u>Garcetti</u>, which, like this case, show the prevalence of First Amendment, retaliation cases involving govenment employees speaking as employees as opposed to citizens speaking on issues of public interest. <u>See, e.g.</u>, <u>Phillips</u>, 499 F.3d 1239; <u>D'Angelo</u>, 497 F.3d 1203; <u>Vila</u>, 484 F.3d 1334. Because the Supreme Court has given us an expedited analysis in <u>Garcetti</u> for these cases that other circuits have adopted and we are using without acknowledging, I would implement the five-part <u>Garcetti/Pickering</u> analysis in our circuit.