[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-11577
Non-Argument Calendar

_____

D.C. Docket No. 1:12-cv-00072-LJA

KATHLEEN STRANG,

Plaintiff-Appellant,

versus

ALBANY GEORGIA,
The City of,
WILLIE ADAMS,
in his personal and official capacity,
DOROTHY HUBBARD,
in her personal and official capacity,
CHRISTOPHER PIKE,
in his personal and official capacity,
ROGER MARIETTA,
in his personal and official capacity, et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(December 31, 2018)

Before ED CARNES, Chief Judge, WILLIAM PRYOR, and ANDERSON, Circuit
Judges.

PER CURIAM:

Kathleen Strang, a former assistant city attorney in Albany, Georgia, brings

a complaint under 42 U.S.C. § 1983 claiming that her First Amendment rights

were violated because she was terminated in retaliation for speaking about a

handgun that her supervisor kept in his office.  The district court granted summary

judgment in favor of the defendants.  Strang now appeals.

I.

Strang was hired as an assistant city attorney in 2006 by City Attorney C.

Nathan Davis.  Her official duties included ensuring "departmental compliance

with all applicable City codes, laws, rules, regulations, standards, policies and

procedures" and "initiating any actions necessary to correct violations."  As part of

her duty to ensure compliance with applicable laws and rules, Strang made several

reports to Davis regarding infractions by city employees.

2

In 2009 Shurell Byrd, a black city employee and friend of Strang's, told Strang about racism exhibited by Byrd's immediate boss, who routinely used the "N" word.[1]  Strang, who is white, orally reported Byrd's account to Davis. Assistant City Attorney Jenise Shicole Smith, who is black, overheard Strang report to Davis "that this guy called black people 'N*****s.'"[2]  Afterwards Smith asked Strang not to use this word.  Strang then became "furious," entered a paralegal's office, and "said the word 'N****r, N****r, N****r, N****r, N****r, N****r, N****r.'"   Strang later said that she did not mean to call Smith a racial slur, but was "ridiculing" the fact that Smith approached Strang as if Strang had used a slur out of racial animus even though Smith knew the context of Strang's report.

In January 2010, the Board of City Commissioners — composed of the mayor and six commissioners — met with Davis to conduct an annual evaluation of his performance.  During that meeting the Board expressed concern about Davis' supervision of Strang, noting that "certain department heads" would not work with Strang due to her inappropriate behavior.  The Board directed Davis to put Strang on an improvement plan and report back.  Davis placed Strang on a

---

[1] Strang referred to the "N" word during her deposition, but testified that Byrd "said the word."

[2] Strang did not pronounce the word with asterisks; we have added them to avoid echoing the full racist force of the word.

coaching plan that required her to:  "(1) attend . . . a training class focused on conflict resolution or team building within 30 days and (2) develop a written strategy within 90 days to strengthen her ability to create a collegial atmosphere." Strang was informed that failure to complete the coaching plan could result in disciplinary action, including termination.

Afterwards tensions in the City Attorney's office continued to grow.  In March 2010, Strang alleges that Davis — apparently concerned that Strang's desk was too cluttered — entered her office and swept papers containing work product off of her desk and into the trash can.  Strang decided that she was "going to teach [Davis] a lesson" by "find[ing] a document and mak[ing] it disappear."  After Strang entered Davis' office she could not bring herself to follow through with her plan, but she did open Davis' desk drawer where she discovered a handgun. Strang became "frightened, because [she] really thought that [Davis] had that gun there because he intended to point it at [her]," because "in [her] mind's eye that man hated [her] guts, and he hated [her] guts so much that when [Strang] saw that gun there, [she] thought that that's why it was there."

Strang then brought Niger Thomas, the city's equal employment opportunity manager, to Davis' office to see the gun because Thomas "was a personal friend and she was the EEO person. . . . We shared viewpoints about certain senior city officials and about the way things were done, they were crazy."  Strang described

4

feeling like she needed to get her discovery off her chest and that telling Thomas made the situation feel less dangerous. She asked that Thomas keep the incident a secret to avoid retaliation. Thomas did report Davis, who was suspended without pay for three days.

In April 2010, the staff of the City Attorney's Office went to a professional development lunch. Strang did not attend. The next day Christine Washington, an administrative legal secretary, told Strang that she was "required to attend a mandatory staff meeting" that afternoon. When Strang arrived at the meeting, Washington ordered her to apologize for embarrassing the office by reporting Davis' gun and repeatedly told Strang that she should be fired. Smith, the Assistant City Attorney who had earlier expressed concerns about Strang's language, also "attacked" Strang for three hours by criticizing her work, her handling of a case, and for pretending to work long hours. Strang alleges that, although Davis was not present, he "authorized the staff meeting," likely at the luncheon that Strang had missed.

On May 5, 2010, Davis "requested [Strang's] immediate resignation, allegedly based on office discord." On May 6, 2010, Thomas prepared a memorandum for the mayor concerning "the workplace environment in the City Attorney's Office" including "poor staff relations and longstanding inter-office conflicts" and "palpable tension, mistrust and disrespect." Five days later the

5

Board of Commissioners held a closed executive session, in which commissioners criticized Strang for paying her city-issued cellphone bill late, not getting along with her colleagues, and doing work outside of the City Attorney's Office.

On May 25, 2010, Strang received a Notice of Recommendation of Dismissal from Davis. On June 22, 2010, Strang elected to have a pre-termination hearing before City Manager Alfred Lott, where she presented evidence for Lott to consider in determining whether to approve or reject Davis' termination recommendation. Lott terminated her employment effective June 30, 2010. He determined that her behavior had created a hostile work environment, which was exacerbated by her use of racial slurs. Lott also noted instances in which Davis was unsatisfied with Strang's legal work, and that Strang had not complied with her coaching plan because she failed to complete the course on interpersonal relationships or produce the written strategy document.

On May 10, 2012, Strang filed a complaint under 42 U.S.C. § 1983 against the city, the mayor, the city commissioners, Lott, and Davis alleging that she was terminated in violation of the First Amendment in retaliation for reporting Davis' gun. On March 15, 2016, the defendants filed a motion for summary judgment. Strang litigated the case pro se and managed her own discovery. On April 29, 2016, she filed a motion for discovery sanctions based on the alleged misconduct of Davis, City Commissioner Bob Langstaff, and defense counsel Donald Sweat.

6

The district court granted the defendants' motion for summary judgment and denied Strang's motion for discovery sanctions.  Strang appeals both decisions.

## II.

Strang first challenges the district court's grant of summary judgment to the defendants.  We review de novo a district court's decision to grant summary judgment, drawing "all reasonable inferences in the light most favorable to the non-moving party."  Owen v. I.C. Sys., Inc., 629 F.3d 1263, 1270 (11th Cir. 2011). Summary judgment may be granted only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509–10 (1986) (quotation marks omitted).  A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248, 106 S. Ct. at 2510.

The state may not discharge a public employee in retaliation for speech protected under the First Amendment.  Bryson v. City of Waycross, 888 F.2d 1562, 1565 (11th Cir. 1989).  An employee makes out a prima facie case of First Amendment retaliation by establishing the following elements by a preponderance of the evidence:

> (1) the employee's speech is on a matter of public concern; (2) the employee's First Amendment interest in engaging in the speech outweighs the employer's interest in prohibiting the speech to promote the efficiency of the public services it performs through its employees;

7

and (3) the employee's speech played a "substantial part" in the employer's decision to demote or discharge the employee.

Battle v. Bd. of Regents for Ga., 468 F.3d at 755, 759–60 (11th Cir. 2006) (citation omitted). If a plaintiff successfully makes out a prima facie case then the burden shifts to the employer to show that it would have made the same decision even in the absence of protected conduct. Id.

The district court held that Strang failed to satisfy the first element of her prima facie case. We agree. In order for a plaintiff to meet this requirement the speech in question must be made by a government employee speaking as a citizen on a subject of public concern. Boyce v. Andrew, 510 F.3d 1333, 1342–43 (11th Cir. 2007). If the plaintiff cannot make this showing then "there can be no First Amendment issue, and the constitutional inquiry ends." Id. at 1343. When speech is made pursuant to an employee's official duties, it is not made as a private citizen for First Amendment purposes. Id. at 1342. "Deciding whether a government employee's speech relates to his or her job as opposed to an issue of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Id. at 1343 (quotation marks omitted). The fact that information may be of general interest to the public does not in itself make speech regarding that information a matter of public concern. Id. at 1344.

Here the record shows that Strang was not speaking as a citizen, but as an employee concerned about her job and her own personal safety in the workplace.

8

She spoke to Thomas, her friend and a city employee whose job is related to workplace grievances.  Strang has said that she went to Thomas because she was afraid Davis might "point" the gun at her because he "hated [Strang's] guts."  Not only that but speaking as she did was within the scope of her official duties.  Part of her job was ensuring compliance with city rules, and she had previously taken multiple actions to address infractions by city employees.  So Strang's speech was not made as a private citizen and the district court did not err in granting summary judgment to the defendants.

### III.

Strang next challenges the district court's decision to deny her motion for discovery sanctions against Davis, Langstaff, and Sweat.  She argues that the district court made clearly erroneous findings of fact because Strang provided clear evidence showing that:  (1) "Davis lied repeatedly under oath throughout his deposition regarding material facts under dispute," (2) Langstaff engaged in dilatory tactics during his deposition, and (3) Sweat "fabricated" interrogatory responses without client input.  We disagree.

 "We review a court's imposition of sanctions under its inherent powers for abuse of discretion."  Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc., 561 F.3d 1298, 1303 (11th Cir. 2009).  In making this determination we ask whether

the district court applied the wrong legal standard or made findings of fact that are clearly erroneous.  See id.

Courts possess an inherent power to impose sanctions for litigation misconduct that derives from their need to "manage [their] own affairs so as to achieve the orderly and expeditious disposition of cases."  Id. at 1306 (quotation marks omitted).  This power must be "exercised with restraint and discretion."  Id. (quotation marks omitted).  "The key to unlocking a court's inherent power is a finding of bad faith."  Id.  (quotation marks omitted).  Conduct demonstrating bad faith includes "delaying or disrupting the litigation," id., and making false statements during a deposition for a "harassing or frivolous purpose,"  Byrne v. Nezhat, 261 F.3d 1075, 1125 (11th Cir. 2001) abrogated on other grounds by Douglas Asphalt Co. v. QORE, Inc., 657 F.3d 1146 (11th Cir. 2011).

Strang attempts to demonstrate that Davis made false statements in bad faith during his deposition by pointing to evidence in the record that Strang contends contradicts Davis' testimony.  But she provides no evidence that Davis believed these statements to be untrue or that he made them for a harassing or frivolous purpose.  Inconsistencies in a witness' testimony alone are insufficient to make the finding of bad faith necessary to impose sanctions.  See Byrne, 261 F.3d at 1125 ("Standing alone, a false or inconsistent statement in a deposition does not compel the conclusion of bad faith.").

10

Strang also points to conduct during Langstaff's deposition that she alleges was abusive and dilatory. This conduct includes Langstaff questioning the authenticity of documents he was asked to review during the deposition, claiming not to recall his earlier testimony, and insisting that he be allowed to finish answering Strang's deposition questions when she attempted to cut short his answers. Strang has not produced evidence that Langstaff engaged in this conduct in order to delay or disrupt the litigation. The district court was not requried to find that he acted in bad faith during his deposition.

Finally Strang argues that Sweat "fabricated" interrogatory responses without client input. As evidence of that she points to deposition transcripts in which Davis admits to not personally preparing or drafting responses to Strang's interrogatories. But Strang has pointed to no authority indicating that parties are required to personally draft responses to discovery requests, nor could she. Strang has merely demonstrated that Sweat conformed with the common practice of drafting responses for his clients' approval. The district court did not abuse its discretion in declining to impose sanctions.

**AFFIRMED.**[3]

---

[3] Strang moves unopposed to supplement her appendix and supplemental appendix with pages inadvertently omitted from her original filings. We have reviewed these materials and they do not affect the outcome of this case. Strang's motion is GRANTED.

11